## MURRAY *v.* UNITED STATES

No. 86–995. Argued December 8, 1987—Decided June 27, 1988*

---

*Together with No. 86–1016, *Carter* v. *United States*, also on certiorari to the same court.

534

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE and BLACKMUN, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which STEVENS and O'CONNOR, JJ., joined, *post*, p. 544. STEVENS, J., filed a dissenting opinion, *post*, p. 551. BRENNAN and KENNEDY, JJ., took no part in the consideration or decision of the cases.

*A. Raymond Randolph* argued the cause for petitioners in both cases. With him on the briefs was *Susan L. Launer.*

*Roy T. Englert, Jr.*, argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Weld, Deputy Solicitor General Bryson,* and *Patty Merkamp Stemler.*†

---

†*Larry W. Yackle, John A. Powell, David B. Goldstein,* and *John Reinstein* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal in No. 86–995.

JUSTICE SCALIA delivered the opinion of the Court.

In *Segura* v. *United States*, 468 U. S. 796 (1984), we held that police officers' illegal entry upon private premises did not require suppression of evidence subsequently discovered at those premises when executing a search warrant obtained on the basis of information wholly unconnected with the initial entry. In these consolidated cases we are faced with the question whether, again assuming evidence obtained pursuant to an independently obtained search warrant, the portion of such evidence that had been observed in plain view at the time of a prior illegal entry must be suppressed.

I

Both cases arise out of the conviction of petitioner Michael F. Murray, petitioner James D. Carter, and others for conspiracy to possess and distribute illegal drugs. Insofar as relevant for our purposes, the facts are as follows: Based on information received from informants, federal law enforcement agents had been surveilling petitioner Murray and several of his co-conspirators. At about 1:45 p.m. on April 6, 1983, they observed Murray drive a truck and Carter drive a green camper, into a warehouse in South Boston. When the petitioners drove the vehicles out about 20 minutes later, the surveilling agents saw within the warehouse two individuals and a tractor-trailer rig bearing a long, dark container. Murray and Carter later turned over the truck and camper to other drivers, who were in turn followed and ultimately arrested, and the vehicles lawfully seized. Both vehicles were found to contain marijuana.

After receiving this information, several of the agents converged on the South Boston warehouse and forced entry. They found the warehouse unoccupied, but observed in plain view numerous burlap-wrapped bales that were later found to contain marijuana. They left without disturbing the bales, kept the warehouse under surveillance, and did not reenter it until they had a search warrant. In applying for

the warrant, the agents did not mention the prior entry, and did not rely on any observations made during that entry. When the warrant was issued—at 10:40 p.m., approximately eight hours after the initial entry—the agents immediately reentered the warehouse and seized 270 bales of marijuana and notebooks listing customers for whom the bales were destined.

Before trial, petitioners moved to suppress the evidence found in the warehouse. The District Court denied the motion, rejecting petitioners' arguments that the warrant was invalid because the agents did not inform the Magistrate about their prior warrantless entry, and that the warrant was tainted by that entry. *United States* v. *Carter*, No. 83–102–S (Mass., Dec. 23, 1983), App. to Pet. for Cert. 44a–45a. The First Circuit affirmed, assuming for purposes of its decision that the first entry into the warehouse was unlawful. *United States* v. *Moscatiello*, 771 F. 2d 589 (1985). Murray and Carter then separately filed petitions for certiorari, which we granted,[1] 480 U. S. 916 (1987), and have consolidated here.

## II

The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, *Weeks* v. *United States*, 232 U. S. 383 (1914), and of testimony concerning knowledge acquired during an unlawful search, *Silverman* v. *United States*, 365 U. S. 505 (1961). Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is

---

[1]The original petitions raised both the present Fourth Amendment claim and a Speedy Trial Act claim. We granted the petitions, vacated the judgment below, and remanded for reconsideration of the Speedy Trial Act issue in light of *Henderson* v. *United States*, 476 U. S. 321 (1986). *Carter* v. *United States* and *Murray* v. *United States*, 476 U. S. 1138 (1986). On remand, the Court of Appeals again rejected the Speedy Trial Act claim and did not reexamine its prior ruling on the Fourth Amendment question. 803 F. 2d 20 (1986). Petitioners again sought writs of certiorari, which we granted limited to the Fourth Amendment question.

the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint," *Nardone* v. *United States*, 308 U. S. 338, 341 (1939). See *Wong Sun* v. *United States*, 371 U. S. 471, 484–485 (1963).

Almost simultaneously with our development of the exclusionary rule, in the first quarter of this century, we also announced what has come to be known as the "independent source" doctrine. See *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385, 392 (1920). That doctrine, which has been applied to evidence acquired not only through Fourth Amendment violations but also through Fifth and Sixth Amendment violations, has recently been described as follows:

> "[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Nix* v. *Williams*, 467 U. S. 431, 443 (1984)

The dispute here is over the scope of this doctrine. Petitioners contend that it applies only to evidence obtained for the first time during an independent lawful search. The Government argues that it applies also to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality. We think the Government's view has better support in both precedent and policy.

Our cases have used the concept of "independent source" in a more general and a more specific sense. The more general sense identifies *all* evidence acquired in a fashion untainted

by the illegal evidence-gathering activity. Thus, where an unlawful entry has given investigators knowledge of facts $x$ and $y$, but fact $z$ has been learned by other means, fact $z$ can be said to be admissible because derived from an "independent source." This is how we used the term in *Segura* v. *United States*, 468 U. S. 796 (1984). In that case, agents unlawfully entered the defendant's apartment and remained there until a search warrant was obtained. The admissibility of what they discovered while waiting in the apartment was not before us, *id.*, at 802–803, n. 4, but we held that the evidence found for the first time during the execution of the valid and untainted search warrant was admissible because it was discovered pursuant to an "independent source," *id.*, at 813–814. See also *United States* v. *Wade*, 388 U. S. 218, 240–242 (1967); *Costello* v. *United States*, 365 U. S. 265, 280 (1961); *Nardone* v. *United States*, *supra*, at 341.

The original use of the term, however, and its more important use for purposes of these cases, was more specific. It was originally applied in the exclusionary rule context, by Justice Holmes, with reference to that particular category of evidence acquired by an untainted search *which is identical to the evidence unlawfully acquired*—that is, in the example just given, to knowledge of facts $x$ and $y$ derived from an independent source:

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others." *Silverthorne Lumber*, *supra*, at 392.

As the First Circuit has observed, "[i]n the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when

it arrives through an independent source." *United States v. Silvestri*, 787 F. 2d 736, 739 (1986). We recently assumed this application of the independent source doctrine (in the Sixth Amendment context) in *Nix* v. *Williams, supra.* There incriminating statements obtained in violation of the defendant's right to counsel had led the police to the victim's body. The body had not in fact been found through an independent source as well, and so the independent source doctrine was not itself applicable. We held, however, that evidence concerning the body was nonetheless admissible because a search had been under way which would have discovered the body, had it not been called off because of the discovery produced by the unlawfully obtained statements. *Id.*, at 448–450. This "inevitable discovery" doctrine obviously assumes the validity of the independent source doctrine as applied to evidence initially acquired unlawfully. It would make no sense to admit the evidence because the independent search, had it not been aborted, would have found the body, but to exclude the evidence if the search had continued and had in fact found the body. The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.

Petitioners' asserted policy basis for excluding evidence which is initially discovered during an illegal search, but is subsequently acquired through an independent and lawful source, is that a contrary rule will remove all deterrence to, and indeed positively encourage, unlawful police searches. As petitioners see the incentives, law enforcement officers will routinely enter without a warrant to make sure that what they expect to be on the premises is in fact there. If it is not, they will have spared themselves the time and trouble of getting a warrant; if it is, they can get the warrant and use the evidence despite the unlawful entry. Brief for Peti-

tioners 42. We see the incentives differently. An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it. See Part III, *infra*. Nor would the officer *without* sufficient probable cause to obtain a search warrant have any added incentive to conduct an unlawful entry, since whatever he finds cannot be used to establish probable cause before a magistrate.[2]

It is possible to read petitioners' briefs as asserting the more narrow position that the "independent source" doctrine does apply to independent acquisition of evidence previously

---

[2] JUSTICE MARSHALL argues, in effect, that where the police cannot point to some historically verifiable fact demonstrating that the subsequent search pursuant to a warrant was wholly unaffected by the prior illegal search—*e. g.*, that they had already sought the warrant before entering the premises—we should adopt a *per se* rule of inadmissibilty. See *post*, at 549. We do not believe that such a prophylatic exception to the independent source rule is necessary. To say that a district court must be satisfied that a warrant would have been sought without the illegal entry is not to give dispositive effect to police officers' assurances on the point. Where the facts render those assurances implausible, the independent source doctrine will not apply.

We might note that there is no basis for pointing to the present cases as an example of a "search first, warrant later" mentality. The District Court found that the agents entered the warehouse "in an effort to apprehend any participants who might have remained inside and to guard against the destruction of possibly critical evidence." *United States* v. *Carter*, No. 83-102-S (Mass., Dec. 23, 1983), App. to Pet. for Cert. 42a. While they may have misjudged the existence of sufficient exigent circumstances to justify the warrantless entry (the Court of Appeals did not reach that issue and neither do we), there is nothing to suggest that they went in merely to see if there was anything worth getting a warrant for.

derived *indirectly* from the unlawful search, but does not apply to what they call "primary evidence," that is, evidence acquired during the course of the search itself. In addition to finding no support in our precedent, see *Silverthorne Lumber*, 251 U. S., at 392 (referring specifically to evidence seized during an unlawful search), this strange distinction would produce results bearing no relation to the policies of the exclusionary rule. It would mean, for example, that the government's knowledge of the existence and condition of a dead body, knowledge lawfully acquired through independent sources, would have to be excluded if government agents had previously observed the body during an unlawful search of the defendant's apartment; but not if they had observed a notation that the body was buried in a certain location, producing consequential discovery of the corpse.

## III

To apply what we have said to the present cases: Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply. Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one. See *Nix* v. *Williams*, 467 U. S., at 443.

We think this is also true with respect to the tangible evidence, the bales of marijuana. It would make no more sense to exclude that than it would to exclude tangible evidence found upon the corpse in *Nix*, if the search in that case had not been abandoned and had in fact come upon the body. The First Circuit has discerned a difference between tangible and intangible evidence that has been tainted, in that objects "once seized cannot be cleanly reseized without returning the objects to private control." *United States* v. *Silvestri*, 787

F. 2d, at 739. It seems to us, however, that reseizure of
tangible evidence already seized is no more impossible than
rediscovery of intangible evidence already discovered. The
independent source doctrine does not rest upon such meta-
physical analysis, but upon the policy that, while the govern-
ment should not profit from its illegal activity, neither should
it be placed in a worse position than it would otherwise have
occupied. So long as a later, lawful seizure is genuinely
independent of an earlier, tainted one (which may well be
difficult to establish where the seized goods are kept in the
police's possession) there is no reason why the independent
source doctrine should not apply.

The ultimate question, therefore, is whether the search
pursuant to warrant was in fact a genuinely independent
source of the information and tangible evidence at issue here.
This would not have been the case if the agents' decision to
seek the warrant was prompted by what they had seen dur-
ing the initial entry,[3] or if information obtained during that
entry was presented to the Magistrate and affected his deci-
sion to issue the warrant. On this point the Court of Ap-
peals said the following:

> "[W]e can be absolutely certain that the warrantless
> entry in no way contributed in the slightest either to the
> issuance of a warrant or to the discovery of the evidence

---

[3] JUSTICE MARSHALL argues that "the relevant question [is] whether,
even if the initial entry uncovered no evidence, the officers would return
immediately with a warrant to conduct a second search." *Post*, at 548,
n. 2; see *post*, at 549–550, n. 4. We do not see how this is "relevant" at all.
To determine whether the warrant was independent of the illegal entry,
one must ask whether it would have been sought even if what actually hap-
pened had not occurred—not whether it would have been sought if some-
thing else had happened. That is to say, what counts is whether the actual
illegal search had any effect in producing the warrant, not whether some
hypothetical illegal search would have aborted the warrant. Only that
much is needed to assure that what comes before the court is not the prod-
uct of illegality; to go further than that would be to expand our existing
exclusionary rule.

during the lawful search that occurred pursuant to the warrant.

> "This is as clear a case as can be imagined where the discovery of the contraband in plain view was totally irrelevant to the later securing of a warrant and the successful search that ensued. As there was no causal link whatever between the illegal entry and the discovery of the challenged evidence, we find no error in the court's refusal to suppress." *United States* v. *Moscatiello*, 771 F. 2d, at 603, 604.

Although these statements can be read to provide emphatic support for the Government's position, it is the function of the District Court rather than the Court of Appeals to determine the facts, and we do not think the Court of Appeals' conclusions are supported by adequate findings. The District Court found that the agents did not reveal their warrantless entry to the Magistrate, App. to Pet. for Cert. 43a, and that they did not include in their application for a warrant any recitation of their observations in the warehouse, *id.*, at 44a–45a. It did not, however, explicitly find that the agents would have sought a warrant if they had not earlier entered the warehouse. The Government concedes this in its brief. Brief for United States 17, n. 5. To be sure, the District Court did determine that the purpose of the warrantless entry was in part "to guard against the destruction of possibly critical evidence," App. to Pet. for Cert. 42a, and one could perhaps infer from this that the agents who made the entry already planned to obtain that "critical evidence" through a warrant-authorized search. That inference is not, however, clear enough to justify the conclusion that the District Court's findings amounted to a determination of independent source.

Accordingly, we vacate the judgment and remand these cases to the Court of Appeals with instructions that it remand to the District Court for determination whether the

warrant-authorized search of the warehouse was an independent source of the challenged evidence in the sense we have described.

*It is so ordered.*

JUSTICE BRENNAN and JUSTICE KENNEDY took no part in the consideration or decision of these cases.

JUSTICE MARSHALL, with whom JUSTICE STEVENS and JUSTICE O'CONNOR join, dissenting.

The Court today holds that the "independent source" exception to the exclusionary rule may justify admitting evidence discovered during an illegal warrantless search that is later "rediscovered" by the same team of investigators during a search pursuant to a warrant obtained immediately after the illegal search. I believe the Court's decision, by failing to provide sufficient guarantees that the subsequent search was, in fact, independent of the illegal search, emasculates the Warrant Clause and undermines the deterrence function of the exclusionary rule. I therefore dissent.

This Court has stated frequently that the exclusionary rule is principally designed to deter violations of the Fourth Amendment. See, *e. g., United States* v. *Leon,* 468 U. S. 897, 906 (1984); *Elkins* v. *United States,* 364 U. S. 206, 217 (1960). By excluding evidence discovered in violation of the Fourth Amendment, the rule "compel[s] respect for the constitutional guaranty in the only effectively available way, by removing the incentive to disregard it." *Id.,* at 217. The Court has crafted exceptions to the exclusionary rule when the purposes of the rule are not furthered by the exclusion. As the Court today recognizes, the independent source exception to the exclusionary rule "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix* v. *Williams,* 467 U. S. 431, 443 (1984); see *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 392 (1920). The independent source exception, like the inevitable discovery exception, is primarily

based on a practical view that under certain circumstances the beneficial deterrent effect that exclusion will have on future constitutional violations is too slight to justify the social cost of excluding probative evidence from a criminal trial. See *Nix* v. *Williams, supra,* at 444–446; cf. *United States* v. *Leon, supra,* 906–909. When the seizure of the evidence at issue is "wholly independent of" the constitutional violation, then exclusion arguably will have no effect on a law enforcement officer's incentive to commit an unlawful search.[1]

Given the underlying justification for the independent source exception, any inquiry into the exception's application must keep sight of the practical effect admission will have on the incentives facing law enforcement officers to engage in unlawful conduct. The proper scope of the independent source exception, and guidelines for its application, cannot be divined in a factual vacuum; instead, they must be informed by the nature of the constitutional violation and the deterrent effect of exclusion in particular circumstances. In holding that the independent source exception may apply to the facts of these cases, I believe the Court loses sight of the practical moorings of the independent source exception and creates an affirmative incentive for unconstitutional searches. This holding can find no justification in the purposes underlying both the exclusionary rule and the independent source exception.

The factual setting of the instant case is straightforward. Federal Bureau of Investigation (FBI) and Drug Enforcement Agency (DEA) agents stopped two vehicles after they

---

[1] The clearest case for the application of the independent source exception is when a wholly separate line of investigation, shielded from information gathered in an illegal search, turns up the same evidence through a separate, lawful search. Under these circumstances, there is little doubt that the lawful search was not connected to the constitutional violation. The exclusion of such evidence would not significantly add to the deterrence facing the law enforcement officers conducting the illegal search, because they would have little reason to anticipate the separate investigation leading to the same evidence.

left a warehouse and discovered bales of marijuana. DEA Supervisor Garibotto and an assistant United States attorney then returned to the warehouse, which had been under surveillance for several hours. After demands that the warehouse door be opened went unanswered, Supervisor Garibotto forced open the door with a tire iron. A number of agents entered the warehouse. No persons were found inside, but the agents saw numerous bales of marijuana in plain view. Supervisor Garibotto then ordered everyone out of the warehouse. Agents did not reenter the warehouse until a warrant was obtained some eight hours later. The warehouse was kept under surveillance during the interim.

It is undisputed that the agents made no effort to obtain a warrant prior to the initial entry. The agents had not begun to prepare a warrant affidavit, and according to FBI Agent Cleary, who supervised the FBI's involvement, they had not even engaged in any discussions of obtaining a warrant. App. 52. The affidavit in support of the warrant obtained after the initial search was prepared by DEA Agent Keaney, who had tactical control over the DEA agents, and who had participated in the initial search of the warehouse. The affidavit did not mention the warrantless search of the warehouse, nor did it cite information obtained from that search. In determining that the challenged evidence was admissible, the Court of Appeals assumed that the initial warrantless entry was not justified by exigent circumstances and that the search therefore violated the Warrant Clause of the Fourth Amendment.

Under the circumstances of these cases, the admission of the evidence "reseized" during the second search severely undermines the deterrence function of the exclusionary rule. Indeed, admission in these cases affirmatively encourages illegal searches. The incentives for such illegal conduct are clear. Obtaining a warrant is inconvenient and time consuming. Even when officers have probable cause to support a warrant application, therefore, they have an incentive first

to determine whether it is worthwhile to obtain a warrant. Probable cause is much less than certainty, and many "confirmatory" searches will result in the discovery that no evidence is present, thus saving the police the time and trouble of getting a warrant. If contraband is discovered, however, the officers may later seek a warrant to shield the evidence from the taint of the illegal search. The police thus know in advance that they have little to lose and much to gain by forgoing the bother of obtaining a warrant and undertaking an illegal search.

The Court, however, "see[s] the incentives differently." *Ante*, at 540. Under the Court's view, today's decision does not provide an incentive for unlawful searches, because the officer undertaking the search would know that "his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it." *Ibid.* The Court, however, provides no hint of why this risk would actually seem significant to the officers. Under the circumstances of these cases, the officers committing the illegal search have both knowledge and control of the factors central to the trial court's determination. First, it is a simple matter, as was done in these cases, to exclude from the warrant application any information gained from the initial entry so that the magistrate's determination of probable cause is not influenced by the prior illegal search. Second, today's decision makes the application of the independent source exception turn entirely on an evaluation of the officers' intent. It normally will be difficult for the trial court to verify, or the defendant to rebut, an assertion by officers that they always intended to obtain a warrant, regardless of the results of the illegal search.[2] The testimony of the officers

---

[2] Such an intent-based rule is of dubious value for other reasons as well. First, the intent of the officers prior to the illegal entry often will be of

conducting the illegal search is the only direct evidence of intent, and the defendant will be relegated simply to arguing that the officers should not be believed. Under these circumstances, the litigation risk described by the Court seems hardly a risk at all; it does not significantly dampen the incentive to conduct the initial illegal search.[3]

The strong Fourth Amendment interest in eliminating these incentives for illegal entry should cause this Court to scrutinize closely the application of the independent source exception to evidence obtained under the circumstances of the instant cases; respect for the constitutional guarantee requires a rule that does not undermine the deterrence function of the exclusionary rule. When, as here, the same team of investigators is involved in both the first and second search, there is a significant danger that the "independence" of the

---

little significance to the relevant question: whether, even if the initial entry uncovered no evidence, the officers would return immediately with a warrant to conduct a second search. Officers who have probable cause to believe contraband is present genuinely might intend later to obtain a warrant, but after the illegal search uncovers no such contraband, those same officers might decide their time is better spent than to return with a warrant. In addition, such an intent rule will be difficult to apply. The Court fails to describe how a trial court will properly evaluate whether the law enforcement officers fully intended to obtain a warrant regardless of what they discovered during the illegal search. The obvious question is whose intent is relevant? Intentions clearly may differ both among supervisory officers and among officers who initiate the illegal search.

[3] The litigation risk facing these law enforcement officers may be contrasted with the risk faced by the officer in *Nix* v. *Williams*, 467 U. S. 431 (1984). *Nix* involved an application of the inevitable discovery exception to the exclusionary rule. In that case, the Court stressed that an officer "who is faced with the opportunity to obtain evidence illegally will rarely, if ever, be in a position to calculate whether the evidence sought would inevitably be discovered." *Id.*, at 445. Unlike the officer in *Nix*, who had no way of knowing about the progress of a wholly separate line of investigation that already had begun at the time of his unconstitutional conduct, the officers in the instant cases, at least under the Court's analysis, have complete knowledge and control over the factors relevant to the determination of "independence."

source will in fact be illusory, and that the initial search will have affected the decision to obtain a warrant notwithstanding the officers' subsequent assertions to the contrary. It is therefore crucial that the factual premise of the exception—complete independence—be clearly established before the exception can justify admission of the evidence. I believe the Court's reliance on the intent of the law enforcement officers who conducted the warrantless search provides insufficient guarantees that the subsequent legal search was unaffected by the prior illegal search.

To ensure that the source of the evidence is genuinely independent, the basis for a finding that a search was untainted by a prior illegal search must focus, as with the inevitable discovery doctrine, on "demonstrated historical facts capable of ready verification or impeachment." *Nix* v. *Williams*, 467 U. S., at 445, n. 5. In the instant cases, there are no "demonstrated historical facts" capable of supporting a finding that the subsequent warrant search was wholly unaffected by the prior illegal search. The same team of investigators was involved in both searches. The warrant was obtained immediately after the illegal search, and no effort was made to obtain a warrant prior to the discovery of the marijuana during the illegal search. The only evidence available that the warrant search was wholly independent is the testimony of the agents who conducted the illegal search. Under these circumstances, the threat that the subsequent search was tainted by the illegal search is too great to allow for the application of the independent source exception.[4] The Court's

―――――――――――――

[4] To conclude that the initial search had no effect on the decision to obtain a warrant, and thus that the warrant search was an "independent source" of the challenged evidence, one would have to assume that even if the officers entered the premises and discovered no contraband, they nonetheless would have gone to the Magistrate, sworn that they had probable cause to believe that contraband was in the building, and then returned to conduct another search. Although such a scenario is possible, I believe it is more plausible to believe that the officers would not have chosen to re-

contrary holding lends itself to easy abuse, and offers an incentive to bypass the constitutional requirement that probable cause be assessed by a neutral and detached magistrate before the police invade an individual's privacy.[5]

The decision in *Segura* v. *United States*, 468 U. S. 796 (1984), is not to the contrary. In *Segura*, the Court expressly distinguished between evidence discovered during an initial warrantless entry and evidence that was not discovered until a subsequent legal search. The Court held that under those circumstances, when no information from an illegal search was used in a subsequent warrant application, the warrant provided an independent source for the evidence first uncovered in the second, lawful search.

*Segura* is readily distinguished from the present cases. The admission of evidence first discovered during a legal search does not significantly lessen the deterrence facing the law enforcement officers contemplating an illegal entry *so long as* the evidence that is seen is excluded. This was clearly the view of Chief Justice Burger, joined by JUSTICE O'CONNOR, when he stated that the Court's ruling would not significantly detract from the deterrent effects of the exclusionary rule because "officers who enter illegally will recognize that whatever evidence they discover as a direct result of the entry may be suppressed, as it was by the Court of Appeals in this case." *Id.*, at 812. As I argue above, extending *Segura* to cover evidence discovered during an initial illegal search will eradicate this remaining deterrence to illegal entry. Moreover, there is less reason to believe that

turn immediately to the premises with a warrant to search for evidence had they not discovered evidence during the initial search.

[5] Given that the law enforcement officers in these cases made no movement to obtain a warrant prior to the illegal search, these cases do not present the more difficult issue whether, in light of the strong interest in deterring illegal warrantless searches, the evidence discovered during an illegal search ever may be admitted under the independent source exception when the second legal search is conducted by the same investigative team pursuing the same line of investigation.

an initial illegal entry was prompted by a desire to determine whether to bother to get a warrant in the first place, and thus was not wholly independent of the second search, if officers understand that evidence they discover during the illegal search will be excluded even if they subsequently return with a warrant.

In sum, under circumstances as are presented in these cases, when the very law enforcement officers who participate in an illegal search immediately thereafter obtain a warrant to search the same premises, I believe the evidence discovered during the initial illegal entry must be suppressed. Any other result emasculates the Warrant Clause and provides an intolerable incentive for warrantless searches. I respectfully dissent.

JUSTICE STEVENS, dissenting.

While I join JUSTICE MARSHALL's opinion explaining why the majority's extension of the Court's holding in *Segura* v. *United States*, 468 U. S. 796 (1984), "emasculates the Warrant Clause and provides an intolerable incentive for warrantless searches," *ante* this page, I remain convinced that the *Segura* decision itself was unacceptable because, even then, it was obvious that it would "provide government agents with an affirmative incentive to engage in unconstitutional violations of the privacy of the home," 468 U. S., at 817 (dissenting opinion). I fear that the Court has taken another unfortunate step down the path to a system of "law enforcement unfettered by process concerns." *Patterson* v. *Illinois*, *ante*, at 305 (STEVENS, J., dissenting). In due course, I trust it will pause long enough to remember that "the efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land." *Weeks* v. *United States*, 232 U. S. 383, 393–394 (1914).