*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0044p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

No. 03-3989

ANDRE JENKINS; NATHANIEL S. THOMPSON,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-00112—Lesley Brooks Wells, District Judge.

Argued: September 24, 2004

Decided and Filed: January 28, 2005

Before: MARTIN, COLE, and GIBBONS, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Samuel A. Yannucci, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellant. Thomas S. Hudson, Sarasota, Florida, Roger M. Synenberg, LAW OFFICES OF ROGER M. SYNENBERG, Cleveland, Ohio, for Appellees. **ON BRIEF:** Samuel A. Yannucci, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellant. Thomas S. Hudson, Sarasota, Florida, Roger M. Synenberg, LAW OFFICES OF ROGER M. SYNENBERG, Cleveland, Ohio, for Appellees.

———————

## OPINION

———————

JULIA SMITH GIBBONS, Circuit Judge. Defendants-appellees Andre Jenkins and Nathaniel Thompson, charged with possession with intent to distribute cocaine, moved to suppress evidence obtained during two searches. The district court granted the defendants-appellees' motions, and the government appeals. The government argues that the district court erred in suppressing the evidence, as the evidence is admissible under the independent source doctrine, under the good faith exception to the warrant requirement, or because it was obtained through a search based on a valid warrant. For the reasons set forth below, we reverse the district court's ruling suppressing the evidence obtained from both searches and remand the case for trial on the merits.

1

## I.

At 10:28 p.m. on February 13, 2003, Andre Jenkins and Nathaniel Thompson entered the Holiday Inn in Beachwood, Ohio. In the course of renting a room, Thompson offered his identification to the front office manager, Robert Jeffries, who made a photocopy of the ID and noted that it identified Thompson as a local resident.[1] After paying cash to rent Room 127 for two nights, the two men unloaded what appeared to the office manager to be very heavy bags from their Ford Explorer onto a luggage cart, which they then took to the room. Jeffries found these circumstances to be suspicious, so he contacted John Kornek, a Beachwood police officer and member of the Ohio High Intensity Drug Trafficking Area (HIDTA) Task Force, and reported the activities of the two men as well as the license plate number of the Explorer. Members of the HIDTA Task Force had asked Jeffries to report any suspicious behavior among guests at the hotel, and Jeffries had done so numerous other times over the previous year and a half.

Officer Kornek immediately called Officer Kevin Grisafo, another policeman and member of the HIDTA Task Force, and suggested that he go to the Holiday Inn to follow up on Jeffries's report. Officer Grisafo noted that Room 127 had a do-not-disturb sign on the door, and he ran checks on Thompson and the Explorer. Thompson had been arrested twice for drug-related offenses and had a conviction for carrying a concealed weapon. The Explorer was registered to Bonnie Jones at 11906 Imperial, in Cleveland, who herself had a criminal record (including drug-related offenses).[2] Officer Grisafo acquired the room across the hall from Room 127 for surveillance purposes, and he contacted IRS Agent Mark Kahler, who sent three HIDTA Task Force agents to staff the surveillance room. Officer Grisafo parked across the street from the hotel. At approximately 4:25 a.m., he saw a Suburban pull into the hotel parking lot, circle through the lot, exit the lot, and then reenter the lot, dropping off a woman at the lobby. The Suburban again exited the lot and parked across the street at another hotel, even though there was ample parking at the Holiday Inn. The driver walked quickly back to the Holiday Inn and entered through a locked hotel entrance, using a room key. He met the woman he had dropped off in the lobby, and together they entered Room 127. Officer Grisafo ran a check on the Suburban, tracing it to Lacell Torrence, who himself had a number of arrests on his record.[3] At about 8:30 a.m. on February 14, a police dog gave a positive indication for the presence of narcotics in the Suburban. Around noon that day, the driver of the Suburban walked out of the room and left the hotel carrying several towels. FBI Agent Kenneth Riolo approached the individual, who identified himself as Andre Jenkins and stated that he had been applying for a job "across the street." Mr. Jenkins denied that he had been in the Holiday Inn with a female, denied that he had any contraband on him, and gave permission for Agent Riolo to search the car. Agent Riolo and other officers searched Mr. Jenkins, who had a small bag of marijuana, $1500 in cash, two cell phones, and a pager on his person. The officers did not search the car. Agent Riolo believed the woman in the room might have seen the search of Mr. Jenkins through the window, so he advised other HIDTA Task Force officers on the scene to secure Room 127 to prevent the destruction of evidence and to further "officer safety."

Throughout the morning and during this time, Officer Grisafo had been passing on information to IRS Agent Mark Kahler at the HIDTA Task Force office so that Kahler could prepare an affidavit for a search warrant covering the Suburban and Room 127. Meanwhile, after Jenkins

---

[1]Neither Jeffries nor any law enforcement personnel knew that the other man was Andre Jenkins until he was arrested the next day.

[2]Jones testified that she has never been arrested or convicted, explaining that her criminal record nonetheless includes several offenses because her sister used her name in committing those crimes.

[3]Officer Grisafo testified that Mr. Torrence had a "long history of drug offenses," but his record included only a series of arrests, not convictions, and only one was drug-related.

was searched, officers entered Room 127, although witness accounts of their entry differ. Officers Grisafo and Kornek testified that they, along with another officer, knocked on the door, and the woman, who identified herself a few minutes later as Joyce Bell, let them in after being informed the police were in the process of getting a search warrant and wanted to secure the room. Bell, however, testified that a female housekeeper, who she saw through the door's peephole, knocked on the door instead of the officers. Bell stated that she cracked open the door to retrieve towels from the housekeeper, but the officers then "busted in the room," knocking her onto the floor of the closet with the door. She also testified that a gun was pointed at her.

Regardless, all witnesses agreed that Bell was only partially clothed, and Officer Kornek took her to a chair in the back of the room so that she could get dressed. He checked the chair and her clothes for weapons and asked if she would consent to a search of the room, including three bags of luggage stacked against the wall and an apparently empty bag lying beside them. Bell agreed, indicating that neither the hotel room nor the bags were hers. Bell and Kornek both testified that at the time of the officers' entry into Room 127, the bags were stacked against the wall (where one could not see inside them), and neither Bell nor Kornek touched the bags or saw any of the other officers touch them. Nevertheless, when Officer Grisafo, who had remained by the doorway inside the room while Bell gave consent to search the room, entered the room, he saw one of the bags on the bed, "wide open," "unzipped enough where it was pulling apart," with "brick-type items in there wrapped in cellophane." Officer Kornek agreed that at some point one of the bags was moved to the bed, where it lay partially open, but he did not know how the bag was moved.

The only witness to testify that he touched the bags was Agent Riolo, who entered the room about five minutes after the officers' initial entry. After being told that Bell consented to a search of the room and its contents, and noting that the room key sat on the counter between the beds, he announced that the officers should wait for a warrant to search the room.[4] Riolo also testified that when he entered the room, at least one of the bags lay on the bed, with the zipper partially open, exposing some orange brick-shaped items. Riolo proceeded to pick up all of the bags and feel them, noting that they were full (of "bricks") and very heavy. On cross-examination he explained his decision to touch the bags before the warrant was issued: "I just felt I should touch them and see what there was inside. If it was soft and it was clothes, or maybe I just wanted to feel them and see how heavy they were and get that information back to Mr. Kahler," the agent preparing the warrant affidavit.

When Agent Riolo entered the room, Officer Grisafo left to meet Agent Kahler at the HIDTA Task Force office to review the affidavit (which Kahler had evidently completed) for accuracy. Before Grisafo arrived, Kahler was informed that there were bricks in the bags,[5] but Kahler decided to exclude this information and the information provided by the confidential informant (Jeffries) from the affidavit, both to protect the identity of the source and because the affidavit was "more than sufficient" without that information. On the way to the Cuyahoga County courthouse to have a magistrate sign the warrant, Kahler conferred by phone with an Assistant County Prosecutor, who advised him to make sure that the judge was aware that the officers had already secured Room 127. When Kahler and Grisafo met with Judge Brian Corrigan, Kahler "informed him of the probable cause within the warrant as well as probable cause not in the warrant." In other words, Kahler and Grisafo orally informed the judge about the brick-shaped packages in the open bag on the bed, as well as about the manner in which Jenkins and Thompson checked into the hotel, even though this

---

[4]At about this time, Bell was taken from the room to the Beachwood jail. She testified that before she left, she saw the officers opening drawers and looking behind curtains but did not observe them take any other actions inside the room.

[5]Although it is unclear from the record, it appears that Riolo called Kahler after Riolo felt the bags to let Kahler know of the bricks inside.

information was not in the affidavit.  Kahler also told the judge that officers had secured Room 127. When asked at trial whether he thought the oral information affected the judge's decision to issue the warrant, Agent Kahler stated:

> A: Well, to the best of my ability, I felt the warrant stood on its own.  Did it affect his decision?  I felt going through the probable cause of what we had in the warrant affected his decision.
> Q: Including the fact that you told him orally that there were brick-shaped objects?
> A: Yes, but I first went over what's in the warrant and then I went over here's what's not in the warrant....[I]f I thought it affected his decision as much as occurred in the past, he would have instructed me to add a paragraph.

At about 1:30 p.m., the judge "swore [Officer Grisafo] to the information that had been provided and signed the warrants."[6]  Officer Grisafo immediately called Riolo to let him know the warrant had been signed.  While  Grisafo and Kahler were still in the judge's chambers, Riolo searched the bags and informed Grisafo, Kahler, and the judge that the bags contained roughly seventy kilos of cocaine.[7]

Later in the day on February 14, Cuyahoga County Corrections Officer Eugene Sanchez booked Andre Jenkins at the county jail.  Jenkins repeatedly asked Sanchez if he could make a phone call, but Sanchez was under orders to not allow Jenkins to use the phone.  Sanchez eventually told Jenkins he would make a call for him, at which point Jenkins wrote a name and number on a piece of paper and told Sanchez three times "to let Bon know to clean up, they are coming." Sanchez immediately passed on this information and the piece of paper to Officer Kornek, who traced the number to a Mr. Jones at 11906 Imperial in Cleveland, the same address to which the Explorer driven by Jenkins and Thompson was traced.  Based on this information, the information contained in the affidavit for the warrant for Room 127, and other information gathered by various law enforcement officials that day, Agent Kahler and Officer Randy Wilson prepared an affidavit and search warrant for 11906 Imperial.  In the affidavit, Wilson reported the message from Jenkins to Sanchez as "get the shit out as the police [are] coming."  Wilson testified at trial that he could not recall whether those were the exact words relayed to him, but he said they were at least very similar to what he was told by another officer.  At approximately 10:00 p.m. on February 14, Judge Corrigan signed the warrant for 11906 Imperial; it was executed later that evening.  The search of the residence yielded a Rolex watch, two firearms, and $68,000 in cash, among other items.

On March 18, 2003, defendants-appellees Andre Jenkins and Nathaniel Thompson were indicted for possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1)–(b)(1)(A) and 18 U.S.C. § 2.  On April 17, 2003, defendant-appellee Jenkins moved to suppress the Rolex, firearms, and cash seized during the search of 11906 Imperial.  On May 8, 2003, defendant-appellee Jenkins moved to suppress the cocaine seized in Room 127 of the Holiday Inn. On May 16, 2003, defendant-appellee Thompson also moved to suppress the cocaine.  The district court granted all three motions to suppress on June 15, 2003.  The government appealed from the order of suppression on July 11, 2003.

---

[6]Officer Grisafo testified that the judge had him "swear to everything I told him orally and what was written out."

[7]There were seventy-three kilos of cocaine in the bags.

## II.

This court reviews a district court's decision on a motion to suppress under two standards. "Findings of fact are upheld unless clearly erroneous, while conclusions of law are reviewed *de novo*." *United States v. Leake*, 95 F.3d 409, 416 (6th Cir. 1996).

## A.

The government first argues that the cocaine is admissible under the independent source doctrine. Application of the independent source doctrine is a mixed question of law and fact that is reviewed *de novo*. *Id.*

The independent source rule holds that evidence will be admitted if the government shows that it was discovered through sources "wholly independent of any constitutional violation." *Id.* at 412 (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). In deciding whether the independent source rule allows the admission of evidence that would otherwise be excluded, courts "should keep in mind the underlying question: 'whether, granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Since Agent Riolo's touching of the bags before the warrant issued was unlawful,[8] the question is whether application of the exclusionary rule to the cocaine would put the police in the same, but not a worse, position than they would have been absent any error or misconduct. *See Nix*, 467 U.S. at 443. If it would put the police in a worse position, in that the cocaine was nonetheless discovered through sources "wholly independent of any constitutional violation," then the independent source doctrine applies. *Leake*, 95 F.2d at 412; *see Murray v. United States*, 487 U.S. 533, 541 (1988).

According to *Murray*, a subsequent search pursuant to a warrant would not be an independent source of evidence unearthed by a previous search if the information obtained during the first search was "presented to the Magistrate and affected his decision to issue the warrant." *Id.* at 542. In *Murray*, the police illegally searched a warehouse but then prepared a warrant based only on their observations before the illegal search. *Id.* at 535-36. The Court remanded the case for determination of whether the warrant for the second search resulted from information independent of the illegal search. *Id.* at 543-44. A strict application of *Murray*'s test of whether information from the first search affected the magistrate's decision, without consideration of other authorities and the underpinnings of the *Murray* reasoning, might well suggest that the district court's suppression of the cocaine was correct. After all, the information from Riolo's unlawful inspection of the bags in Room 127 (as well as from the confidential informant) was presented to the judge at the time the affidavit was presented, and while it is impossible to know whether the oral information "affected" the judge's decision in some way, one would think it likely. Agent Kahler himself testified that he felt that the information the officers told Judge Corrigan affected his decision.

All courts of appeals to have considered the matter, however, have interpreted *Murray* to mean that, in these situations, for evidence to be inadmissible due to the government's failure to collect it via an independent source, the tainted information presented to the judge must affect the judge's decision in a *substantive*, meaningful way. *See, e.g., United States v. Herrold*, 962 F.2d 1131, 1141 (3d Cir. 1992). Under this interpretation of *Murray*, the simple fact that an application for a warrant contains information obtained from an illegal search does not by itself signify that the independent source doctrine does not apply. *Id.* If the application for a warrant "contains probable

---

[8]The picking up and squeezing of bags is a search for Fourth Amendment purposes, *see Bond v. United States*, 529 U.S. 334, 337-39 (2000), and the government conceded at oral argument that Agent Riolo's warrantless search was unlawful.

cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were not prompted to obtain the warrant by what they observed during the initial entry." *Id.* at 1141-42. Other circuits have joined the Third Circuit and interpreted *Murray* in the same way, and no circuit has taken a contrary approach. *See, e.g., United States v. Markling*, 7 F.3d 1309, 1315-16 (7th Cir. 1993) (considering whether probable cause remained after purging tainted information from a warrant and noting that "[t]his is the approach federal courts...typically take" in applying *Murray*); *United States v. Restrepo*, 966 F.2d 964, 968-70 (5th Cir. 1992) (interpreting *Murray* to mean that "evidence obtained in an illegal search is first excised from the warrant affidavit, after which the expurgated version is evaluated for probable cause"); *United States v. Halliman*, 923 F.2d 873, 880-81 (D.C. Cir. 1991) (finding that despite the inclusion of tainted information in a warrant application, "there [were] overwhelming independent grounds for probable cause" in the application); *United States v. Gillenwaters*, 890 F.2d 679, 681-82 (4th Cir. 1989) (setting aside facts illegally obtained from the rest of the information in an affidavit and then examining the affidavit for probable cause); *United States v. Veillette*, 778 F.2d 899, 903-04 (1st Cir. 1985) (same).

The rationale for explicitly linking the *Murray* independent source rule with the approach of considering the sufficiency of the untainted affidavit, as other circuits have done, is sound and consistent with the rationale underlying *Murray*. The idea behind *Murray* and related cases is that police who carry out a search that they should not have carried out should be put in the same, *but no worse*, position than they would have been absent any error or misconduct. *See Murray*, 487 U.S. at 541; *Nix*, 467 U.S. at 443. Invalidating a search warrant because the magistrate was affected in some minor way by tainted information, when the warrant would have been granted even without the tainted information, would put the police in a worse position than they would have been in had they not presented the tainted information to the magistrate. In addressing an analogous situation, the Supreme Court in *Franks v. Delaware*, 438 U.S. 154, 171-72, 172 n.8 (1978), suggested that false or reckless statements in a warrant should be set aside and that the warrant should then be examined to determine "if what is left is sufficient to sustain probable cause." Since "[k]nowingly including a false statement in a warrant affidavit seems the functional equivalent of (if not an even more serious transgression than) including in the affidavit knowledge of facts illegally obtained," *see Veillette*, 778 F.2d at 904, then it makes sense to deal with cases such as the present one in the same fashion utilized by the Supreme Court in *Franks*. *See also United States v. Johnston*, 876 F.2d 589, 594 (7th Cir. 1989) (Posner, J., concurring) (noting that the Supreme Court in *Franks* assumed without holding that "a search warrant procured on the basis of an affidavit that contains unlawfully obtained information is nevertheless valid if the lawfully obtained information in the affidavit is sufficient by itself to establish probable cause for the search" and collecting cases concurring in this rule).

The approach adopted in *Herrold* and other cases of considering the sufficiency of probable cause in a warrant after removing the "taint" has been applied by this court. In *United States v. Shamaeizadeh*, 80 F.3d 1131, 1136 (6th Cir. 1996), we articulated a principle we referred to as "closely resembl[ing] the independent source rule" and held that "[w]hen a trial court is presented with a redacted affidavit, it must review each portion of that affidavit so that the reviewing court may determine whether the untainted portion of the affidavit . . . sufficiently supported a finding of probable cause." (citation and quotation marks omitted). We further stated that, "[i]rrespective of the legality of the initial [action], we can nevertheless examine the balance of the underlying search warrant affidavit for probable cause in order to determine whether the lawfully obtained evidence was sufficient to determine that the search and seizure should be upheld." *Id.* (citations and quotation marks omitted); *see also United States v. Black*, 8 Fed. Appx. 408, 411-13 (6th Cir. 2001) (relying on *Herrold* to strike factual averments "tainted" by an illegal search from an affidavit and holding that probable cause existed even without that information); *cf. United States v. Dice*, 200 F.3d 978, 985-86 (6th Cir. 2000) (holding that violation of knock-and-announce rule during

execution of valid search warrant precluded application of the independent source rule to evidence seized in search following violation).**9**

This court also adopted a similar approach in pre-*Murray* cases. For instance, in *United States v. Smith*, 730 F.2d 1052, 1056 (6th Cir. 1984), two defendants argued that an affidavit in support of a search warrant contained information obtained during an illegal search incident to the arrest of one of the defendants. The court did not decide whether the search during the course of the arrest was impermissible, finding that even if it were, there was sufficient probable cause for the search warrant to issue based upon pre-arrest observations. *Id*. The court stated:

> [I]t is well settled that: when a search warrant is based partially on tainted evidence and partially on evidence arising from independent sources, if the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted.

*Id*. (citations and quotations omitted). Likewise, in *United States v. Korman*, 614 F.2d 541, 547 (6th Cir. 1980), the defendant argued that certain evidence obtained as a result of an allegedly illegal initial search of the defendant's residence was included on an affidavit for a search warrant of that residence. This court held that irrespective of any illegally obtained information in the affidavit, there was sufficient "independent and legitimately obtained evidence" to establish probable cause. *Id*.

In sum, authority from this and other circuits, as well as the principles underlying the *Murray* rule, support an interpretation of the independent source rule that incorporates consideration of the sufficiency of the untainted affidavit to see if probable cause exists without the tainted information. Applying this approach to the present case, once the tainted information – the information orally conveyed to Judge Corrigan – is eliminated, the probable cause analysis focuses on the written affidavit. A court determining the sufficiency of an affidavit in support of a search warrant is concerned only with the statements contained within the affidavit itself. *United States v. Hatcher*, 473 F.2d 321, 323 (6th Cir. 1973). Defendants-appellees argue that the affidavit for Room 127, when examined without the tainted information, is a "bare bones" affidavit that does not indicate "a 'fair probability' that evidence of a crime will be located on the premises of the proposed search." *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir. 1990) (quoting *United States v. Algie*, 721 F.2d 1039, 1041 (6th Cir. 1983)). As defendant-appellee Thompson himself points out in his brief, though, "it has been the rare case in which the Sixth Circuit has found a search warrant based on an informant tip to be inadequate *if* the information has been corroborated to some degree." Indeed, the affidavit for Room 127 contains a particularized account of facts and circumstances that amount to a "fair probability" that evidence could be found in the room, including: the payment of cash, the suspicious driving pattern of the Suburban, the criminal history of the renter of the room and the owner of the Suburban, the police canine's positive indication for narcotics in the Suburban, and the marijuana found on Jenkins. Taken by itself, and considering the totality of the circumstances, the affidavit provides sufficient probable cause for the warrant. *See Illinois v. Gates*, 462 U.S. 213, 230-32 (1983). Thus, the district court erred in suppressing the cocaine, because there was a sufficient

---

**9**In *United States v. Dice*, this court refused to adopt a rule, "derivative of the 'independent source doctrine,'" that when police officers violate the knock-and-announce requirement but have a valid warrant, the exclusionary rule should not apply to any evidence obtained as a result of the search. 200 F.3d at 982. The court distinguished cases such as *Murray* as involving two searches (an illegal search followed by a second, legal search), instead of just one search involving a Fourth Amendment violation. *See id*. at 985-86. While the argument could feasibly be made that this reasoning applies to the present case, in that Riolo's initial squeezing of the bags was part of the same search carried out after the warrant issued, the holding of *Dice* is limited to the knock-and-announce situation. *See id.*

basis for the warrant that was wholly independent from any "tainted" information orally communicated to the issuing judge.

**B.**

The government next argues that the district court erred in suppressing the evidence because the good faith exception to the exclusionary rule applies. The question whether the good faith exception to the exclusionary rule, as set out in *United States v. Leon*, 468 U.S. 897, 922-23 (1984), applies is a question of law reviewed *de novo* by this court. *Bowling*, 900 F.2d at 930. In *Leon*, the Supreme Court held that evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a neutral and detached magistrate need not be excluded from presentation at trial, even if the warrant is subsequently invalidated. 468 U.S. at 922. The test of good faith is an objective one: "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23.

The government's reliance on the good faith exception is erroneous. The illegal search at issue – the officers' inspection of the bags in Room 127 – occurred *before* the warrant was issued, and thus the cocaine could not be admissible under a doctrine that requires reasonable reliance on a warrant. Put simply, there was no warrant upon which the officers could rely in good faith. *Cf. United States v. Marion*, 238 F.3d 965, 967-70 (8th Cir. 2001) (applying the good faith exception to evidence seized in a search carried out after the warrant issued, even though the affiant officer was one of the executing officers). Though the government emphasizes them in its brief, the facts that the officers "deferred any substantial searching until after the warrant was obtained" and that the illegal touching of the bags was "brief and occurred after a lawful entry to secure the premises" are immaterial. The district court was correct not to apply the *Leon* good faith exception with respect to the cocaine.

**C.**

The final issue to consider is whether the district court erred in suppressing the fruits of the search of 11906 Imperial because there is a sufficient basis for the warrant even when the underlying affidavit is stripped of references to any "tainted" information. In reviewing the district court's decision whether probable cause existed to issue a search warrant, this court employs a deferential standard and seeks to determine whether "the facts and circumstances described in the affidavit indicate a 'fair probability' that evidence of a crime will be located on the premises of the proposed search." *Bowling*, 900 F.2d at 930 (citation omitted); *see also United States v. Spikes*, 158 F.3d 913, 922-23 (6th Cir. 1998) ("The ultimate question of whether the search or seizure is reasonable under the Fourth Amendment remains subject to *de novo* review."); *Restrepo*, 966 F.2d at 971 (reviewing a probable cause determination *de novo* after expunging the warrant affidavit of tainted information).

Since we have decided that there was sufficient probable cause for the Room 127 warrant even without the tainted information, then there is no need to strike the reference to the cocaine found in Room 127 from the warrant affidavit for 11906 Imperial. With this reference intact, it is clear that probable cause existed to search the residence. The affidavit connected the residence to the cocaine in Room 127 in two different ways: first, through the Explorer used by the two men checking into the room, and second, through the phone number given by Andre Jenkins (who had exited from Room 127) to Officer Sanchez at the jail. Considering seventy-three kilos of cocaine had been found in Room 127, this information was clearly enough to demonstrate a "'fair probability' that evidence of a crime" would be located at 11906 Imperial. *Bowling*, 900 F.2d at 930 (citation omitted). Therefore, since we hold that the district court erred in suppressing the cocaine, then the warrant for 11906 Imperial is valid, and the district court also erred in suppressing the evidence obtained from the search of that address.

### III.

The district court did not err in failing to apply the good faith exception to the exclusionary rule to the cocaine. However, the cocaine should still have been admitted because there was a sufficient basis for the Room 127 warrant that was wholly independent from any "tainted" information orally communicated to the issuing judge. Therefore, for the reasons set forth above, we reverse the district court's ruling suppressing the evidence from both the search of Room 127 and the search of 11906 Imperial and remand the case for trial on the merits.