NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0386n.06

Case No. 15-3801

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 08, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| MICHAEL WILLIAMS, | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| _____/ | ) | |

Before: MERRITT, SUHRHEINRICH, and DONALD, Circuit Judges

**MERRITT, Circuit Judge.** In this case, the government conducted two searches of a house—the first without a warrant and illegal; the second with a warrant reciting information recovered during the illegal search. The United States as plaintiff-appellant appeals the district court's suppression of evidence gathered during the warranted search of the house that defendant-appellee Michael Williams and his associates used as a stash house for illegal narcotics. This case presents a Fourth Amendment problem because officers first used an illegal search of the stash house to obtain information that was subsequently recited in a warrant authorizing the second search of the house. The district court suppressed the evidence recovered from the warranted search, finding that officers used the illegal search to gather evidence for the subsequent warranted search. On appeal, the United States concedes that the initial search of the

residence was illegal, but argues that the evidence is nevertheless admissible under the "independent source doctrine" because the illegal search did not prompt police to seek the warrant, and because the warrant affidavit established probable cause to search irrespective of the information obtained through the illegal search. After reviewing the record, we reject the government's arguments and **AFFIRM** the district court.[1]

### I. Facts

As a result of a nearly eight-month investigation of a Cincinnati-area heroin-trafficking ring involving Michael Williams and his associate Christopher Gulley, police obtained and executed search warrants for Williams's and Gulley's respective homes on 119 Retreat St. in Bellevue, Kentucky ("Retreat St.") and 403 Elberon Ave. in Cincinnati, Ohio ("Elberon Ave.") in the early morning hours of June 11, 2014. The warranted searches revealed significant evidence of drug trafficking that corroborated other evidence police had compiled over the course of the investigation. Items found during the warranted searches included: heroin, cash, firearms, a kilogram press, and several sets of keys.

As police completed the searches of the Retreat St. and Elberon Ave. homes, officers began turning their attention to 239 McCormick Place ("McCormick Place")—a residence that police believed Williams and Gulley used as a stash house for illegal narcotics. Police had already been surveilling McCormick Place as part of the investigation. The surveillance revealed that Williams and Gulley visited the house, that the frequency, length, and duration of these visits were identical to prior visits to other suspected stash houses, that Williams and Gulley both

---

[1] The district court followed the logic outlined by the Supreme Court in *Murray v. United States*, 487 U.S. 533, 540 (1988):

> An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause . . . .

had keys to open the front door of the residence, that no one appeared to be living in the house, and that a Pontiac Montana—a vehicle suspected of trafficking drugs for the organization—had regularly visited the residence.

Sergeant Cliff Mitchell and other officers drove from Elberon Ave. to McCormick Place, apparently in anticipation of a magistrate issuing a search warrant for McCormick Place. According to Mitchell's testimony, another officer, Matthew Waters, was already in the process of preparing a warrant affidavit for McCormick Place as Mitchell and his colleagues arrived at McCormick Place.

After arriving, Mitchell and his colleagues did not wait for a search warrant to issue. Instead, they tested a set of keys the police took from Gulley's Elberon Ave. home in the front door of McCormick Place. One of the keys unlocked the front door, knocking it "ajar." A few moments later, officers heard footsteps in the house, and an alarm sounded. Officers then entered the residence and conducted a "protective sweep." Officers found three large dogs in the basement and David Richardson and his girlfriend in an upstairs bedroom. Richardson told officers that he was Williams's uncle; that the house belonged to Williams; and that Williams provided him with a key to the house. Officers radioed the information obtained as a result of their warrantless search to Officer Waters, who placed it in the warrant affidavit.

Officer Waters then filed the affidavit with a Hamilton County Judge, and the Judge signed and issued a search warrant for the McCormick Place residence later that morning. The subsequent warranted search revealed heroin, a kilogram press, and multiple firearms.

The evidence recovered from the Retreat St., Elberon Ave., and McCormick Place residences formed the basis for a six-count federal indictment against Williams and his associates. At a suppression hearing, Williams asked the district court to suppress the evidence

obtained through the warranted search of the McCormick Place residence. In a June 26, 2015 opinion and order, the district court suppressed the evidence obtained from the warranted search of McCormick Place. The court determined that the search warrant affidavit was tainted because the illegal search prompted officers to seek the warrant, and because without the information obtained through the illegal search, there was not sufficient probable cause to justify the issuance of the warrant. The United States appeals to this Court for reversal.

## II. Discussion

The United States concedes that officers' initial search of McCormick Place violated the Fourth Amendment, and invokes the independent source doctrine to argue that the district court should not have suppressed evidence obtained through the subsequent warranted search because this evidence was obtained *independently* of any constitutional violation.

The independent source doctrine requires courts to admit evidence "if the government can show that it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). The idea behind the independent source doctrine is that "police who carry out a search that they should not have carried out should be put in the same, but *no worse*, position than they would have been in absent any error or misconduct." *United States v. Jenkins*, 396 F.3d 751, 758 (6th Cir. 2005) (emphasis in original).

In order to show that the independent source doctrine applies to a warrant based on both legally and illegally obtained information, the government must make two showings by a preponderance of the evidence. *United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. 2009). First, the government must show that the initial illegal search did not prompt officers to seek a warrant for the second search. *Murray v. United States*, 487 U.S. 533, 542 (1988); *see Jenkins*, 396 F.3d

at 758. This is a fact-based inquiry that requires the district court to assess the record. *Murray*, 487 U.S. at 540 n.2. While officers' testimony regarding whether the illegal search led police to seek a warrant is probative of this question, the Supreme Court has instructed district courts not to give dispositive effect to officer assurances that a warrant would have been sought in the absence of the illegal search. Instead, "[w]here the facts render [officer] assurances implausible, the independent source doctrine will not apply." *Id.*

The government also must show that a neutral magistrate would have issued the search warrant even if she was not presented with the information obtained from the illegal search. *Jenkins*, 396 F.3d at 761. Courts make this determination by excising the illegally obtained information from the affidavit and then deciding whether the remaining *legally* obtained information sufficiently supports a finding of probable cause to search. *Id.* at 760. The standards that guide our determination of probable cause are well settled:

> The task of the [Court] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The district court made such a decision. It concluded that the illegal search of McCormick Place prompted police to seek a warrant for the second search of the residence. Specifically, the district court determined that police illegally searched McCormick Place in order to establish probable cause for a search warrant. We review the district court's factual determinations on a motion to suppress for clear error. *United States v. Master*, 614 F.3d 236, 238 (6th Cir. 2010) (citing *Jenkins*, 396 F.3d at 757).

In attacking the district court's conclusion, the government appears to rely solely on Sergeant Mitchell's testimony at the suppression hearing. The illegal search did not prompt police to seek a warrant for McCormick Place, the government says, because Mitchell testified at the suppression hearing that the illegal search had "no bearing on [police] serving the search warrant," which, according to Mitchell, was already being prepared when officers arrived at McCormick Place. But Mitchell's inconsistent testimony and other facts speak louder than Mitchell's self-serving assurance, and thus we are not left with the definite and firm conviction that the district court erred in finding that the illegal search of McCormick Place prompted police to seek a warrant.

While Mitchell did state that police would have sought the warrant irrespective of the illegal search, the district court's reasonable reading of the record "render[s] [Mitchell's] assurance[] implausible." *Murray*, 487 U.S. at 540 n.2. Mitchell testified that officers used a key recovered during the warranted search of the Elberon Ave. residence to open the front door of McCormick Place—an act the government concedes was an illegal search—in order to make a connection between Elberon Ave., a house where officers had just found significant evidence of drug trafficking, and McCormick Place. At the suppression hearing, Mitchell elaborated:

> We wanted to make sure that the key that we got from Elberon was the key that fit that door and it made a connection from Elberon to McCormick. It showed that someone at that address had a connection at Elberon—or I'm sorry, at McCormick.

The meaning of this statement is clear: officers illegally searched McCormick Place in order to gather probable cause for the subsequent warrant. This reading of the situation undermines Mitchell's assurances that police would have sought a warrant irrespective of the illegal search. Presumably, if the key did not fit the door, there would not have been a later search. Thus,

Mitchell's testimony (when combined with the information's subsequent inclusion in the warrant affidavit) provides the district court with a sound basis for finding that the illegal search prompted police to seek a warrant.

The fact that police waited to seek a warrant for McCormick Place until *after* officers discovered incriminating evidence as part of the illegal search only lends additional support to the district court's conclusion. While it is certainly possible that the police may have still sought a warrant for McCormick Place even if officers found no incriminating evidence during the illegal search, the district court's finding comports with the more plausible interpretation that "officers would not have chosen to return immediately to [McCormick Place] with a warrant to search had they not discovered [incriminating] evidence during the initial search." *Murray*, 487 U.S. at 549 n.4 (Marshall, J., dissenting).

Finally, we are satisfied that the district court's suppression of the evidence seized at McCormick Place advances the deterrence function of the Fourth Amendment's exclusionary rule. Indeed, a contrary finding would "emasculate[] the Warrant Clause" because it would give police the affirmative incentive to conduct illegal searches to ascertain whether probable cause exists for a subsequent warranted search. *Id.* at 544. The Fourth Amendment simply does not countenance such "an intolerable incentive for conducting warrantless searches." *Id.* at 551.

Because the district court did not commit clear error in finding that the illegal search of McCormick Place prompted officers to seek a warrant, we need not consider whether the warrant affidavit, when excised of the information obtained in the illegal search, nevertheless established probable cause to search McCormick Place.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.