**Dale G. STARKEY, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–10593.

Court of Appeals of Alaska.

March 9, 2012.

Rehearing Denied April 6, 2012.

Robert John, Fairbanks, for the Appellant.

Mary A. Gilson, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

In early April 2008, a group of law enforcement officers went to the Salcha residence of Dale G. Starkey in response to a tip that he was growing marijuana on a commercial scale. The officers attempted to make contact with Starkey, but no one was home. While they were standing in the yard, the officers smelled the odor of growing marijuana, they heard the noise of lighting ballasts and/or fans coming from within the house, and they saw numerous items in the yard (dozens of one- and five-gallon buckets, plus a quantity of fertilizer and growing medium) that were indicative of an ongoing agricultural endeavor.

Based on the informant's tip and on these corroborative observations, the officers decided to seek a warrant to search Starkey's residence. One of the officers—Investigator Garrett Frost—left the scene to apply for the warrant, while the rest of the officers waited at the residence, both to secure the residence pending the issuance of the warrant and to aid in the search after the warrant was issued.

While the officers were waiting at the residence, Starkey came home. After the officers apprised Starkey of the situation, Starkey seemingly gave the officers permission to enter his house without a warrant. We say "seemingly" because the superior court later found that, even though a reasonable law enforcement officer would have believed that Starkey consented to the entry, Starkey had not actually given unequivocal consent to the entry.

Inside Starkey's residence, the officers observed some five dozen marijuana plants. The officers then tried to contact Investigator Frost to apprise him of this discovery, but they could not reach him; Frost was already in the process of presenting the search warrant application to the magistrate.

About five minutes later, Frost contacted the officers at the scene to announce that he had obtained the search warrant, and that he was returning to the residence. When Frost returned, he served a copy of the warrant on Starkey—but by that time, the other officers were already in the process of dismantling and seizing Starkey's marijuana growing operation.

Starkey was ultimately convicted of fourth-degree controlled substance misconduct under AS 11.71.040(a)(3)(G)—possession of twenty-five or more marijuana plants.

As we explained above, Starkey seemingly gave the officers permission to enter and search his house, and the officers initially entered the house on this basis, without waiting for Investigator Frost to obtain the search warrant. But the superior court later

ruled that Starkey had not given unequivocal consent to this entry and search, and that the discovery and seizure of Starkey's marijuana plants could not be sustained under a "consent" theory. The primary question presented in this appeal is whether the issuance of the search warrant (only minutes later) cured whatever defect there may have been in the initial entry and search of Starkey's residence.

### Was there a defect in the initial entry and search of Starkey's residence?

After Starkey was indicted for fourth-degree controlled substance misconduct, his attorney filed a motion seeking suppression of the marijuana plants and other evidence seized from Starkey's home. Superior Court Judge Paul R. Lyle held an evidentiary hearing to investigate this matter.

At the evidentiary hearing, the State relied on the theory that Starkey had consented to the officers' entry into his house, but Judge Lyle concluded that the search of Starkey's house could not be upheld on that basis. Specifically, Judge Lyle found (1) that a reasonable, objective observer on the scene *could have thought* that Starkey had consented to the entry and search of his residence, and thus the officers acted in good faith when they entered Starkey's home without a warrant, but (2) Starkey did not *actually* give an unequivocal consent to the entry and search.

In their briefs to this Court, both Starkey and the State apparently assume that Judge Lyle's findings preclude any further argument that the entry and search of Starkey's residence could be justified as a consent search. But that is not so.

The law is currently unsettled as to whether, when the government claims that a search was lawful under a "consent" theory, the validity of the consent should be assessed according to (1) the facts and circumstances as they appeared, at the time, to a reasonable person in the police officer's position, or (2) all the relevant facts developed at a later evidentiary hearing, and assessed in hindsight.

This question is discussed at length in Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed. 2004), § 8.1(b), Vol. 4, pp. 15–19. Professor LaFave notes that, although early decisions on this point focused on whether the suspect had *actually* given a voluntary consent to the search, the great weight of authority now favors the "circumstances as they reasonably appeared" approach. In a supplemental footnote that appears in his 2011–12 pocket part, Professor LaFave writes:

> As noted in [*United States v.*] *Grap*, [403 F.3d 439 (7th Cir.2005) ], the "standard of what is reasonably apparent to a reasonable inquiring officer, with its emphasis on the deterrence rationale of the exclusionary rule, is the correct approach", and thus "after-presented evidence" as to the person's actual mental condition "would be relevant only to impeach the credibility of the officer or to shed any light on what was reasonably apparent to him when he obtained the consent."

*Search and Seizure,* Pocket Part for 2011–12, p. 4, new footnote 54.1.

Although we note this question of law, we conclude that we should not decide it. First, the parties have not briefed this question. Second, as we are about to explain, the validity of Starkey's consent is a moot issue: the seizure of Starkey's marijuana plants was rendered lawful when, a few minutes after the officers' initial entry, a judicial officer issued an untainted search warrant for the residence.

### Why we conclude that the issuance of the search warrant cured any defect in the officers' initial entry and search of Starkey's residence

When Starkey's suppression motion was litigated in the superior court, the parties and Judge Lyle framed the issue as whether, because of the issuance of the search warrant, the marijuana plants growing in Starkey's house would have been "inevitably discovered". But the facts of this case are more accurately characterized as a situation where the government had an "independent source" for the evidence.

The "inevitable discovery" doctrine applies to situations where the government concedes that the challenged evidence was obtained unlawfully, but argues that the evidence inevitably would have been lawfully discovered and seized if events had run their course. The "independent source" doctrine, on the other hand, applies to situations where, despite a preceding illegal search or seizure, the government ultimately obtained the challenged evidence in an ostensibly lawful manner (*e.g.*, under the authority of a search warrant), and the question is whether the government's authority for seizing the evidence was indeed independent of the prior illegality.

This distinction is explained by Professor LaFave: "[T]he inevitable discovery [doctrine] is hypothetical in nature, [and] it does not apply if [an] alternative, legitimate source is actually used to seize the evidence". Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed. 2004), § 11.4(a), Vol. 6, p. 265, n. 55.[1] This distinction was also addressed by the Alaska Supreme Court in *Smith v. State*, 948 P.2d 473 (Alaska 1997):

> [P]roperly applied, the "independent source" exception [to the exclusionary rule] allows the prosecution to use evidence only if it was, in fact, obtained by fully lawful means.... The "inevitable discovery" exception ... differs in one key respect[:] ... the [challenged] evidence ... [was] not actually ... obtained from an independent source, but rather *would have been* discovered as a matter of course if independent investigations [had been] allowed to proceed.

*Smith*, 948 P.2d at 479–480 (emphasis added, and citations omitted).

One further aspect of the "independent source" doctrine must be emphasized: the doctrine applies to situations like the one in Starkey's case—situations where the police initially discover the evidence unlawfully, but ultimately take possession of the evidence through a lawful means that is untainted by the prior illegality. As Professor LaFave explains:

> [The "independent source" doctrine] applies not only to [situations where the] evidence [is] obtained for the first time during an independent lawful search, but also to [situations where the] evidence [is] initially discovered during, or as a consequence of, an unlawful search, but later obtained independently [through] activities untainted by the initial illegality. Thus, as in *Murray* [*v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)], bags of marijuana first seen by the police during an illegal warrantless search of a warehouse may, when later seized under a warrant to search that place, have an independent source in the warrant—*provided*, of course, that neither the decision to seek that warrant nor the decision to issue it was influenced by the earlier illegal entry and viewing of the bags.

*Search and Seizure*, § 11.4(a), Vol. 6, p. 261 (internal quotation marks omitted; emphasis in the original).

The Alaska Supreme Court applied this principle in *Cruse v. State*, 584 P.2d 1141 (Alaska 1978). In *Cruse*, law enforcement officers opened the trunk of a vehicle and discovered evidence of a recently committed robbery. The police suspected that their search of the trunk might have been illegal, but they also believed that there was sufficient probable cause to justify a search of the trunk (even without knowing its contents), so the officers applied for a search warrant and did not tell the magistrate about the earlier discovery of the evidence. The magistrate issued the warrant, the vehicle was searched again, and the evidence was seized.[2] Cruse was later convicted of robbery.[3]

On appeal, Cruse argued that the initial search of the trunk was unlawful, and that this unlawful search tainted the later search warrant.[4] The Alaska Supreme Court concluded that there was no need to decide whether the initial search of the trunk was

---

**1.** Quoting *State v. Boll*, 651 N.W.2d 710, 716 (S.D.2002).

**2.** *Cruse*, 584 P.2d at 1143.

**3.** *Id.* at 1142.

**4.** *Id.* at 1144.

lawful—because, even if the initial search was unlawful, the later search warrant constituted an independent source for the evidence.[5]

The supreme court noted that the "independent source" doctrine stemmed from the United States Supreme Court's decision in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *Wong Sun* is the seminal case defining the "fruit of the poisonous tree" doctrine—the rule that all evidence deriving from unlawful police conduct must be suppressed. In *Wong Sun,* the Supreme Court declared that the test for suppression of derivative evidence was whether the challenged evidence "had been [obtained] by exploitation of [the original] illegality or instead by means sufficiently distinguishable to be purged of the primary taint."[6]

Applying this rule, the Alaska Supreme Court declared that the question to be decided in Cruse's case was "whether the subsequent search warrant [was] a product of the prior allegedly illegal trunk search".[7] The court held that the search warrant was not tainted:

> The [challenged] evidence here was obtained through information wholly independent of the initial trunk search. The evidence presented to the district court in support of the search warrant was procured without resort to any clue or knowledge gained from the trunk search. [And the] investigation leading to the lawful search [under the authority of the warrant] was not intensified or significantly focused by reason of any tainted information.

*Cruse,* 584 P.2d at 1145. Thus, the supreme court concluded, the later search of the trunk conducted under the authority of the search warrant was not tainted by any potential illegality in the initial search of the trunk. *Ibid.*

Starkey's case is governed by this same "independent source" principle.

■ Even if we assume for purposes of argument that the officers' initial entry into Starkey's residence and their initial search of the residence were unlawful, the fact remains that this initial entry and search occurred while Investigator Frost was in the process of applying for a warrant to search Starkey's residence. This search warrant was issued only minutes after the officers made their initial entry into the residence, and Frost immediately notified his fellow officers that the warrant had been issued. Frost then returned to Starkey's residence with the physical warrant, and the warrant was served and executed while the officers were still at the residence.

Thus, the authority granted by the search warrant was an "independent source"—an independent and lawful justification for seizing the marijuana plants from Starkey's residence—provided that the search warrant application was not tainted by information that the officers obtained during their pre-warrant entry into Starkey's house.

Judge Lyle recognized that this potential for taint was an issue, and he made findings on this issue at the conclusion of the evidentiary hearing.

The testimony at the hearing showed that Investigator Frost had already left the scene before Starkey arrived, and before Starkey ostensibly consented to have the officers enter his house. The testimony also showed that two of the officers who remained at the scene *attempted* to contact Frost to tell him that the officers were already inside the house, and that they had discovered marijuana plants, but neither of these officers could reach Frost.

Based on this evidence, Judge Lyle found that none of the officers' observations inside the house were communicated to Frost before he obtained the search warrant, and that Frost did not rely on any of those observations when he applied for the warrant. Thus, neither the decision to apply for the warrant nor the content of the warrant application was tainted by information obtained

---

**5.** *Id.* at 1145.

**6.** *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417 (quoted in *Cruse,* 584 P.2d at 1145).

**7.** *Cruse,* 584 P.2d at 1145.

during the pre-warrant entry into Starkey's residence.

Even though the decision to apply for the search warrant, and the search warrant application itself, were not tainted by any information gained during the initial, pre-warrant entry into Starkey's residence, it is theoretically possible that the *execution* of the warrant—*i.e.*, the scope or intensity of the ensuing search—might have been altered (that is, tainted) by the officers' pre-warrant observations inside Starkey's house. But Starkey did not raise this argument in the superior court, nor has he made this argument on appeal. Moreover, given the nature of the suspected illegal activity (*i.e.*, the large-scale growing of marijuana), it is hard to imagine that any search of the residence would not entail an attempt to locate and seize marijuana plants.

For these reasons, the marijuana plants seized from Starkey's residence were derived from a source that was independent of any potential illegality in the officers' initial entry into the house. Accordingly, the plants were admissible evidence, and the superior court correctly denied Starkey's suppression motion.

### Starkey's alternative argument based on Alaska Evidence Rule 412

In his reply brief, Starkey argues for the first time that Alaska Evidence Rule 412 provides an independent ground for suppressing the marijuana plants, wholly apart from the Fourth Amendment to the federal Constitution or the search and seizure provision of the Alaska Constitution (Article I, Section 14). Evidence Rule 412 provides, with certain exceptions not pertinent here, that "[e]vidence illegally obtained shall not be used over proper objection by the defendant in a criminal proceeding".

Starkey argues that, because Evidence Rule 412 does not explicitly incorporate either the "independent source" doctrine or the "inevitable discovery" doctrine, neither of these doctrines survived the enactment of Evidence Rule 412. In other words, Starkey argues that the Alaska Supreme Court, by enacting Evidence Rule 412, abrogated the independent source doctrine and the inevitable discovery doctrine.

Because this argument is raised for the first time in Starkey's reply brief, it is waived, and we shall address it no further. *See, e.g., Petersen v. Mutual Life Ins. Co. of New York*, 803 P.2d 406, 411 (Alaska 1990); *Douglas v. State*, 215 P.3d 357, 366 (Alaska App.2009).

### Starkey's alternative argument that the search warrant application failed to establish probable cause for the search

In his application for the search warrant, Investigator Frost informed the magistrate that the authorities had received a tip from a confidential informant on April 3, 2008 (*i.e.*, six days before the warrant application) that Dale Starkey was growing large numbers of marijuana plants at his Salcha residence. The confidential informant stated that Starkey had approximately 200 marijuana plants in the residence, and the informant claimed to have personally seen marijuana plants growing inside the residence in the past.

Frost further informed the magistrate that, around noon on April 9th, he and several other officers went to Starkey's residence, hoping to find him there and to speak with him about this allegation. They knocked on the door, but no one responded to their knocking. However, while standing at the door, they could smell "a strong odor of plant marijuana" emanating from the house. They could also hear the sounds of what seemed to be lighting ballasts and/or ventilating fans running inside the residence. The officers observed that the electric meter for the property was spinning "at an unusual[ly] fast pace" for a building of comparatively small size (16 feet by 20 feet).

In addition, the officers observed twenty-five 5-gallon buckets and twenty 1-gallon buckets lying outside in plain view, as well as a 30-pound bag of growing medium (plant starter/fertilizer). Frost told the magistrate that it was common for marijuana growers to keep and use large numbers of buckets, because they grow each individual plant in a separate bucket. Frost stated that the large number of buckets in Starkey's yard tended to show that Starkey was growing marijuana

in criminal quantities (*i.e.*, that he was growing a large number of plants that would yield more than four ounces of harvested marijuana).[8]

In addition to the foregoing information, Frost included a statistical analysis of the Matanuska–Susitna Drug Enforcement Unit's raids on marijuana growing operations during the preceding four years. This analysis was provided to Frost by Investigator Kyle Young. Here, *verbatim*, is what Investigator Frost told the magistrate about this statistical analysis:

> Of the marijuana grows seized by the Mat–Su Drug Unit during this time period, 81 were discovered by officers smelling the odor of cultivating marijuana. Of these 81 cases:
>
> 90.2% contained over one pound of marijuana.
>
> 92.6% contained over 1/4 pound of marijuana.
>
> Of the cases with less than 1/4 pounds of marijuana, 2 were felony commercial grow operations and 4 were harvested between the time officers smelled the grow and the grow was seized, and much of the marijuana was distributed prior to seizure (based upon statements from the defendants and evidence of harvest and/or dismantle).
>
> This data indicates that when [an] officer can smell the odor of cultivating marijuana on the outside air or during contact at the suspect's residence, 96% of the time it is a felony level, commercial grow operation.

It appears that Frost put this information in the search warrant application to bolster the conclusion that Starkey was growing marijuana in criminal quantities, based on the smell of growing marijuana emanating from the residence.

Starkey argues that Investigator Young's statistical analysis of the 81 marijuana raids was of questionable scientific validity, and that Investigator Frost should not have been allowed to rely on this statistical analysis in his search warrant application until the statistical information was subjected to a *Daubert/Coon* analysis.[9]

When this issue was raised in the superior court, Judge Lyle concluded that Young's statistical analysis of the prior drug raids was not "scientific" evidence for purposes of *Daubert* and *Coon*, but was rather a report or summary of information accumulated by the Mat–Su drug unit through actual experience. Judge Lyle accordingly concluded that, under the Alaska Supreme Court's decision in *Marron v. Stromstad*, 123 P.3d 992, 1004 (Alaska 2005), Young's statistical analysis did not need to satisfy the *Daubert/Coon* test.

We believe that Judge Lyle's resolution of this issue was correct. Although there were certainly grounds for questioning the validity of the conclusions that Investigator Young drew from the 81 prior cases, Young's conclusions were not "scientific" for *Daubert* purposes, because they "did not rest on arcane scientific principles, or on the results of experiments or tests that could only be understood and interpreted by experts." *Ratliff v. State*, 110 P.3d 982, 985 (Alaska App.2005). Rather, Young's conclusions rested on fairly straightforward mathematics—and some implicit or unarticulated assumptions about the facts of the 81 underlying cases. The *Daubert/Coon* test does not apply to this kind of evidence.

We note, in addition, that even if this statistical analysis of the prior 81 cases were removed from Investigator Frost's search warrant application, the application would still provide probable cause for the search warrant.

---

8. See *State v. Crocker*, 97 P.3d 93, 96 (Alaska App.2004), where this Court held that no search warrant can issue for evidence of marijuana possession unless the State affirmatively establishes probable cause to believe that the type of marijuana possession at issue is something other than the type of possession protected by Alaska's right to privacy as construed in *Ravin v. State*, 537 P.2d 494 (Alaska 1975), and *Noy v. State*, 83 P.3d 538, 542–43 (Alaska App.2003), *on rehearing*, 83 P.3d 545, 546–48 (Alaska App.2003).

9. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *State v. Coon*, 974 P.2d 386, 394 (Alaska 1999) (adopting the *Daubert* standard for evaluating the admissibility of scientific evidence).

According to the application, the authorities received a tip from a confidential informant that there were large numbers of marijuana plants growing in Starkey's residence in Salcha. When the officers visited Starkey's residence, they smelled growing marijuana; they heard noise coming from inside the house indicating the presence of electrical ballasts and/or ventilating fans; they observed that the house appeared to be using an unusual amount of electricity; they found a large number of buckets in Starkey's yard (nearly four dozen), of the sort used by marijuana growers; and they observed a 30-pound bag of growing medium.

Even without Young's statistical analysis (and Young's accompanying assertion that the perceptible smell of marijuana is a reliable indicator of a large marijuana growing operation), the information contained in the search warrant application justified the magistrate's conclusion that there was probable cause to believe that Starkey was using his residence to grow marijuana in criminal quantities.

Starkey attempts to avoid this result by asserting that Frost's inclusion of Young's statistical analysis in the search warrant application was "part of a conscious effort to circumvent and undermine the constitutional safeguard of probable cause". In other words, Starkey asserts that Frost's inclusion of this information was an intentional attempt to mislead the magistrate into issuing a search warrant that was not actually justified—thus requiring invalidation of the search warrant, regardless of whether this information made any difference to the showing of probable cause.

(See State v. Malkin, 722 P.2d 943, 946 n. 6 (Alaska 1986), as interpreted in Lewis v. State, 862 P.2d 181, 186–87 (Alaska App. 1993), and Gustafson v. State, 854 P.2d 751, 756 (Alaska App.1993)—both holding that, for purposes of applying the suppression rule announced in Malkin, a conscious misstatement or omission in a search warrant application is "intentional" only if it was done in a "deliberate attempt to mislead" the issuing magistrate.)

It is unclear whether Starkey preserved this claim in the superior court. It is true that, at the evidentiary hearing, Starkey's attorney asserted that the state troopers knew that Young's statistical analysis was flawed, and the defense attorney declared that the troopers' inclusion of these statistics in the search warrant application was "a blatant and ... intentional" misrepresentation to the court. But when Judge Lyle announced his decision (denying Starkey's suppression motion), the judge declared—without objection from the defense attorney—that the question of whether Young intentionally tried to mislead anyone, or whether Young recklessly disregarded the truth when he applied for the search warrant, was "not really an issue in this case".

Moreover, even if this issue was preserved, Judge Lyle explicitly found "that the State [had] met its burden of showing that [Young's] statistical analysis [was] valid." This was tantamount to a finding that Young had not acted recklessly when he compiled his statistical analysis, and that Frost had not acted recklessly when he included this information in the search warrant application.

For these reasons, we reject Starkey's contention that the search warrant application contained intentional misstatements.

*Conclusion*

The judgement of the superior court is AFFIRMED.