2021 IL App (2d) 190858-U
No. 2-19-0858
Order filed December 21, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-939 |
| JAMES F. HAUBRICH, | ) ) | Honorable Brian F. Telander, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court properly summarily dismissed defendant's postconviction petition where defendant failed to demonstrate that his counsel arguably was ineffective for not raising an issue on direct appeal.

¶ 2    Defendant, James F. Haubrich, appeals the summary dismissal of his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). He contends that his petition stated the gist of a meritorious claim that his appellate counsel was ineffective. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4    Defendant was charged with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2014)); reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2014)); unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a), 1.1(e) (West 2014)); unlawful possession of firearm ammunition by a felon (720 ILCS 5/24-1.1(a), 1.1(e) (West 2014)); armed violence (720 ILCS 5/33A-2(a), 33A-3(a) (West 2014)); a second count of armed violence (720 ILCS 5/33A-2(b), 33A-3(b-5) (West 2014)); and intimidation (720 ILCS 5/12-6(a)(1) (West 2014)).  The charges centered on defendant's confrontation with Marteze Nelson on the evening of April 20-21, 2014, in defendant's apartment.

¶ 5    Before trial, defendant moved to suppress evidence seized in a warrantless search of the apartment, unit 230 at 131 Elk Trail in Carol Stream.  The trial court heard the motion.

¶ 6    Defendant testified on direct examination as follows.  On April 21, 2014, at about noon, he was walking on a path near 131 Elk Trail.  Police detective John Grey and an officer approached him with their guns drawn and ordered him to kneel.  He complied.  Grey searched defendant, finding a set of keys.  Grey asked defendant to accompany him to apartment 230 and let him test whether the keys fit the locks.  Defendant refused, so Grey took the keys.  He let defendant go, told him to leave the complex, and said that he could pick up his keys later at the police station.

¶ 7    Defendant testified that he did not go to the police station.  Two days later, he returned to apartment 230, where his roommate, Robert Williams, gave him extra keys.  Eventually, he learned that the apartment had been searched without a warrant or his consent.

¶ 8    Defendant testified on cross-examination as follows.  When the police stopped him, he was accompanied by Jimmie Parker.  Defendant told Grey that he lived in Glendale Heights.  His state identification card, which he was carrying, gave his address as 51 Hestermann Drive in Glendale Heights, his mother's home.  Grey told defendant that he had heard "some ridiculous allegations

from somebody in the complex of something happening the night before." Grey said something about a shooting in apartment 230. Defendant denied knowing of any such thing. He told Grey that he had spent the previous night in Hanover Park and did not reside in apartment 230.

¶ 9    The parties stipulated that, in the initial search of the apartment, the police recovered a bullet fragment from the foyer carpet and apparent cannabis from a rear bedroom. The parties also stipulated to the admission of the search warrant that the police obtained after the initial entry.

¶ 10    The State called Detective Grey, who testified on direct examination as follows. On April 21, 2014, before he began his shift, he learned that Nelson, who lived at 161 Elk Drive, had just called the police and said that defendant and another man had shown up at his apartment. The previous night, Nelson called the police and said that he bought cocaine from defendant at 131 Elk Drive, apartment 230; that he consumed the cocaine in his apartment; and that shortly afterward, he returned to apartment 230 to buy more cocaine and got into an altercation with defendant.

¶ 11    Grey testified that, on the morning of April 21, 2014, after being briefed, he and Officer Egan interviewed Nelson outside 161 Elk Drive. Nelson told them that defendant and Parker had shown up at his apartment and knocked on his window. Nelson hid in the bathroom. He believed that defendant and Parker had come there because of what had happened the prior evening. Nelson said that he had purchased crack cocaine from defendant several times at 131 Elk Drive, apartment 230. That morning, before Nelson called the police, Grey learned from another officer that, reportedly, defendant resided in apartment 230 with Robert Williams.

¶ 12    Grey testified that, after speaking with Nelson, he and Egan began walking toward 131 Elk Drive to interview defendant about Nelson's allegations. As they started to leave, Nelson pointed to defendant, who was walking with Parker, and said that he was the one who had shot at him twice the previous night. Grey and Egan approached defendant and Parker, unholstered their guns,

and pointed them downward. Grey ordered defendant and Parker to get on their knees and put their hands behind their backs; both complied. Pat-downs revealed no weapons on either one. Detective Dunniman and Officer Konoir arrived. Defendant and Parker were separated. Grey and Dunniman spoke to defendant while Egan and Konoir spoke to Parker.

¶ 13    Grey testified that defendant told him that he resided at the Glendale Heights address on his identification card. Grey confirmed the information via police radio. Grey asked whether defendant had gone to Nelson's apartment and knocked on the window; defendant said no and that he did not know what Grey was talking about. Grey then told defendant that Nelson had said that drugs were being sold out of defendant's apartment and that, in the apartment, defendant had pulled a firearm and fired two rounds at Nelson. Defendant responded that he did not know what Grey was talking about and that he had spent the entire night in Hanover Park. Grey asked defendant whether he lived at 131 Elk Drive, apartment 230; defendant said no and that his sole residence was in Glendale Heights.

¶ 14    Grey testified that defendant consented to another search of his person, and Grey recovered an identification card and a set of keys. He returned the items to defendant. Grey then asked defendant whether the keys would unlock the door to apartment 230. Defendant responded that they would not, because they were for his mother's home in Glendale Heights. Grey did not ask defendant to come with him to try the keys on apartment 230. He asked him for permission to search the apartment. Defendant provided an "indirect denial or refusal," saying that, because he did not live there, he could not provide consent.

¶ 15    Grey testified that Parker told Egan that he and defendant had walked to 161 Elk Drive and knocked on Nelson's window. Parker said that he was trying to be the peacemaker between defendant and Nelson. Grey then asked defendant to let him take the keys and try them on

apartment 230. Defendant nodded his head and handed Grey the key. Grey gave defendant his business card and said that he could pick up the keys later at the police station. He let defendant leave, and he and the other officers headed to defendant's apartment.

¶ 16 Grey testified that the officers entered 131 Elk Drive and confirmed that apartment 230 was where Nelson had said. The officers knocked on the door and announced their presence but got no response. Grey took out defendant's keys and tried them on the doorknob and top deadbolt locks. The keys worked, and Grey opened the door. About three feet away, on the apartment's foyer carpet, was a silver object, which Grey believed was a spent round from a firearm.

¶ 17 Grey testified that, after he opened the door, all four officers were still standing in the common hallway outside the apartment. Before entering, the officers again announced their presence. Receiving no response, they entered the apartment and, out of concern for their safety, began a "protective sweep." They unlocked and entered the back bedroom. On a side table in plain view was a plastic bag containing apparent cannabis, packaged for sale. The officers did not disturb the bag or the bullet fragment. After determining that nobody else was in the apartment, they exited. The other three officers secured the area, and Grey left to apply for a search warrant.

¶ 18 Grey testified on cross-examination that the first time that the police learned of the alleged incident was 11 p.m. on April 20, 2014, when Nelson's brother Jonathan encountered another officer, Blair. Later, Blair told Grey that Jonathan had appeared intoxicated. Jonathan told Blair that defendant had pulled a gun on an unspecified person about two weeks ago. About an hour later, Jonathan encountered Blair again and told him that his brother Marteze had been the victim. Blair then talked to Nelson, who told him that the incident happened only a few hours earlier; that he had used crack cocaine that evening; and that he made one purchase and attempted another one.

¶ 19    After hearing arguments, the trial court ruled that the initial entry into apartment 230 was not justified by any exception to the warrant requirement. The court was "okay with everything that happened up to [Grey] going to the door and establishing that the keys worked in the locks." Grey acted on credible information that Nelson had bought drugs from defendant several times in apartment 230 and that, on the evening of April 20, 2014, he did so twice. The stop and pat-down were proper, and, although defendant told Grey that he did not reside at 131 Elk, Grey disbelieved him in light of the information he had received previously. Defendant consented to Grey's request to test the keys in the locks of apartment 230. However, defendant did not consent to an entry into or search of the apartment. The officers tested the keys and discovered that they fit the locks; but, "[w]hen they open the door and they look in, clearly, that's a search."

¶ 20    The court then held that the search was improper. The State had not proved abandonment: the officers had reason to believe that defendant lived there. Second, the search was not justified as a protective sweep. There was no shooter, and the police could have secured the premises and obtained a search warrant. By opening the door and viewing what had been concealed, the officers conducted an improper search.

¶ 21    The court recognized that a second inquiry was needed, into whether any of the evidence seized during the execution of the search warrant would have to be suppressed. That turned on the "independent-source" test of *Murray v. United States*, 487 U.S. 533, 542 (1988). If (1) the officers' decision to seek the warrant was prompted by what they had seen during the initial entry or (2) information obtained during the initial entry affected the decision to issue the warrant, then the evidence seized per the warrant would have to be suppressed. The State had the burden to prove the independent source. The court then held an evidentiary hearing on the *Murray* issue.

¶ 22    At the hearing, Grey testified on direct examination, in relevant part:

"Q. Irrespective of the results of your trying the keys in the door, what had you planned on doing with your investigation in the next steps, after your conversation with [defendant] *** what was the next steps [*sic*] going to be in your investigation?

A. *** Nelson had given us information about a possible witness that was in the residence at the time of the alleged shooting. I would have followed up with that information. I would have—would have probably brought my victim and had him physically—

MR. LYON [defendant's attorney]: Object to what he would probably have done, Judge.

THE COURT: Overruled.

THE WITNESS: I would have probably had my victim physically bring me to the apartment where he was alleging the crime occurred. There was [*sic*] some steps that I performed after the search on that date that—I still would have performed. I reinterviewed [Nelson] at the Carol Stream Police Department."

¶ 23 Grey testified further that, after the initial search, apartment 230 was secured. He returned to the police station, where he reinterviewed Nelson and showed him a photographic lineup, from which Nelson selected defendant as the person who shot at him. Nelson also told him that apartment 230 had been the scene of the shooting. Grey then recorded a third interview with Nelson. Later, in the warrant application, Grey included the information gained in the further investigation.

¶ 24 The examination continued:

"Q. Detective Grey, did your observations, the fact that you see a bullet fragment and cannabis inside the apartment, affect your decision to obtain a search warrant for the residence?

A. Not at all.

Q. Why didn't it?

A. Based upon the evidence that I already had at hand, the statements from the victim, multiple statements from the victim that never changed, they were consistent throughout. The initial statements to the officers that night, the initial statement to me in person, his recorded interview was consistent, nothing changed with him. The fact that he made a physical identification of [defendant] that day ***, the fact that he was very descriptive in the—of the apartment unit that he was in, *** which we corroborated, prior to the entry, he said it was, you know, that second door on the second floor of 131, we were able to corroborate just by walking up there. And then his recorded interview, again, consistent statements, the fact that he identified [defendant] in the photo spread, nothing changed my decision to contact the State's Attorney's Office and obtain a search warrant for that unit.

Q. Did—and also in your training and experience, is it your practice to investigate or look at the scene of a crime where somebody alleges a crime has been committed?

A. It would be neglectful of me not to as a police officer and a detective."

¶ 25    Grey testified further that, before applying for the warrant, he reviewed Nelson's written statement, which was dated April 21, 2014, at 1:15 a.m. The statement was admitted into evidence.

¶ 26    Grey testified on cross-examination as follows. Before applying for the warrant, he talked with the State's Attorney's office. Defendant's attorney asked whether "the State's Attorneys

explained to [Grey] that it was important to determine whether or not [Grey] would have gotten the search warrant without seeing that bullet fragment." Grey responded, "I guess you can say so, yes." Even before the discussion, Grey knew that this type of determination could be important in such a situation.

¶ 27 Grey testified that, in his report, he wrote the following (as quoted by defendant's attorney):

"[U]pon opening the door to Unit 230, I, along with Officers Eagan [*sic*], Konior [*sic*], and Detective Dunteman [*sic*], observed a silver, metal object on the foyer carpet that appeared, based upon our prior training and experience, as a discharge [*sic*] bullet fragment. Upon observing the suspected bullet fragment, I believe [*sic*] that victim complainant Nelson's allegations [*sic*] that gunshots had been fired within this residence, was likely true. At this point I reasonably inferred that probable cause to obtain a search warrant for this residence had been established."

¶ 28 Grey denied that seeing the bullet fragment "was exactly what prompted [him] to seek a search warrant."

¶ 29 On redirect examination, Grey testified that seeing the bullet fragment was not the only reason that he sought a search warrant. Further, early on the morning of April 21, when Nelson pointed out defendant and told Grey that defendant was the person who had shot at him 12 hours earlier, Grey then believed that he had probable cause to arrest defendant. At the police station, Grey spoke further to Nelson and believed that, as a result, he had probable cause to obtain a search warrant.

¶ 30 The trial court admitted copies of the warrant application and the warrant. In the application, Grey sought permission to search for firearms, ammunition, and spent ammunition;

cannabis and cocaine; cannabis and cocaine paraphernalia; any containers that might contain a firearm or ammunition; and evidence of ownership or occupancy of the apartment.

¶ 31    In alleging that there was probable cause to believe that the foregoing items were on the premises, Grey's affidavit recited, in part, the chronology that his testimony at the first hearing covered.  The affidavit then recounted the following additional facts.  After interviewing Nelson and showing him the photographic lineup from which Nelson selected defendant, Grey viewed defendant's criminal history.  He learned that defendant had a 2010 conviction of unlawful possession of cannabis, committed in 2001, for which he received a year of conditional discharge, and a conviction of armed robbery, committed in 2010, for which he received 13 years' imprisonment.  Based on all the information from his investigation, he believed that there was probable cause to find in apartment 230 evidence of the offenses that were later charged.

¶ 32    In separate paragraphs, the warrant authorized the entry and the seizure of (1) arms, firearms, ammunition, and spent ammunition; (2) cannabis and cocaine; (3) cannabis- and cocaine-related paraphernalia; (4) any packages or containers "which may contain a firearm or firearm ammunition"; and (5) any records containing indicia of the ownership or occupancy of the premises.

¶ 33    After hearing arguments, the trial court stated as follows. *Murray* called for a two-pronged inquiry.  The court turned first to the second prong: whether the information obtained from the initial entry was presented to the magistrate and affected the decision whether to issue the warrant. This inquiry was easily resolved in favor of the State: the information that related to the initial search was limited to one paragraph, and the remaining information was so ample that a neutral magistrate would have issued the warrant based on the information that was not tainted.

¶ 34    The court turned to the first prong: whether, but for the illegal entry, the police would have sought the warrant. The court noted that, by the time the officers tested defendant's keys in the locks for apartment 230, they knew that a criminal complaint had been filed alleging that defendant had fired a gun at Nelson in apartment 230, in connection with a drug transaction between the two men. Nelson had told the officers about the incident and pointed out defendant as the man who discharged the gun at him. The officers had just seen defendant walking near 131 Elk Trail. They had taken keys from defendant, with his consent, and they knew that the keys fit the locks for apartment 230. Even before they tested the keys, the officers had probable cause to obtain a search warrant.

¶ 35    The court recognized that the foregoing did not conclusively resolve whether, even without the illegal entry, the officers would have sought the search warrant. The court noted further, however, that even after completing the first search and observing the bullet fragment and the cannabis, the officers did not immediately apply for a warrant. Instead, Grey followed up by interviewing Nelson, having him identify the perpetrator and disclose more information about what had happened the previous evening. This follow-up work produced most of the factual allegations that the warrant application used to demonstrate probable cause for the search. Although Grey's testimony that he would have sought the warrant even absent the initial entry was not itself dispositive, the remaining evidence supported it. The court concluded that, given all the circumstances, "it can be said with reasonable certainty that [the police] would have sought a warrant regardless and that they would have obtained it." Thus, the court denied defendant's motion to suppress.

¶ 36    After his jury trial, defendant was convicted of one count of reckless discharge of a firearm; two counts of unlawful use of a firearm; and one count of armed violence based on intimidation. He received concurrent prison sentences of, respectively, 3, 10, 10, and 25 years.

¶ 37    On appeal, defendant contended only that he was not proved guilty beyond a reasonable doubt of armed violence. We affirmed. *People v. Haubrich*, 2019 IL App (2d) 160902-U.

¶ 38    In 2019, defendant filed a *pro se* petition under the Act. As pertinent here, it claimed that defendant's appellate counsel had been ineffective for failing to contend that the trial court had erred in denying defendant's motion to suppress. The trial court summarily dismissed the petition. Defendant appealed.

¶ 39                                    III. ANALYSIS

¶ 40    On appeal, defendant contends that his petition stated the gist of a meritorious claim that his appellate counsel was ineffective. Defendant argues that counsel's failure to raise the denial of the motion to suppress was both objectively unreasonable and prejudicial, because the trial court clearly erred in holding that the State met its burden under the *Murray* independent-source test. For the following reasons, we hold that the petition was insufficient.

¶ 41    To survive dismissal at the first stage, a petition under the Act need state only the gist of a meritorious claim of the deprivation of a constitutional right. *People v. Hodges*, 234 Ill. 2d 1, 11 (2009). Our review is *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 387-88 (1998).

¶ 42    Defendant's petition claimed that his appellate counsel rendered ineffective assistance. A postconviction petition alleging ineffective assistance may not be summarily dismissed if it is arguable both that (1) counsel's performance was objectively unreasonable and (2) defendant was prejudiced thereby. *People v. Moore*, 402 Ill. App. 3d 143, 146 (2010). "Prejudice" means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. *Moore*, 402 Ill. App. 3d at 146. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *People v. West*, 187 Ill. 2d 418, 432 (1999). Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence to refrain from raising issues that, in counsel's judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. *West*, 187 Ill. 2d at 435. Accordingly, unless the underlying issue is meritorious, there can be no prejudice from counsel's failure to raise it on appeal. *West*, 187 Ill. 2d at 435.

¶ 43    Defendant contends that he stated the gist of a meritorious claim that his appellate counsel was ineffective for failing to challenge the denial of the motion to suppress. Defendant reasons that he satisfied both prongs of the *Strickland* test for a simple reason: the ruling on the *Murray* issue was wrong, because Grey's own police report proved that he applied for the search warrant only because of what the officers saw in the initial illegal entry and search.

¶ 44    Preliminarily, we note that, had appellate counsel challenged the denial of the motion to suppress, this court would have been required to defer to the trial court's findings of historical fact unless they were against the manifest weight of the evidence, but to review *de novo* the ultimate issue of whether suppression was proper. See *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Here, defendant's claim implicates both factual and legal issues. He argues that Grey's police report proved that only after making the illegal entry and sighting the bullet fragment did he conclude that he had the probable cause needed to seek the warrant. To the extent that the trial court found otherwise, defendant maintains that this finding was against the manifest weight of the evidence. He then reasons that, based on the foregoing factual premise, the court erred in concluding that, absent the initial illegal entry, Grey would have sought the search warrant.

¶ 45    Defendant does not persuade us that it is arguable that, had appellate counsel raised the suppression issue, this court would have agreed and reversed the judgment. Therefore, because defendant's postconviction petition did not satisfy the prejudice prong of the *Strickland* test, we need not separately address the performance prong of the test. (We note, however, that our holding that a challenge to the ruling on the motion to suppress would not have been reasonably likely to succeed is tantamount to holding appellate counsel's decision to forgo the challenge was not unreasonable performance.)

¶ 46    We shall assume, strictly for purposes of resolving this appeal, that Grey's report proved that it was only after seeing the bullet fragment that he concluded that there was probable cause to seek a search warrant. But even granting as much, it does not follow that, absent the illegal entry and its results, the officers would not have sought the warrant. It means only that they would not have sought the warrant *solely on the basis of what they had learned up to that point*. But the trial court had ample evidence to conclude that, had the police not made the initial entry, they would not simply have given up: they would have obtained further information, then sought a warrant on the basis of that information. The court was correct in drawing this conclusion because, in essence, that was *what actually happened*.

¶ 47    The parties agree that this appeal is governed by *Murray*. Therefore, we explain why *Murray* compels the result that we reach here.

¶ 48    In *Murray*, federal drug agents saw the defendants drive into and then exit a warehouse. *Murray*, 487 U.S. at 535. After the defendants were arrested outside, their vehicles were searched; marijuana was found. *Murray*, 487 U.S. at 535. Several of the agents then entered the warehouse illegally and found what appeared to be marijuana. *Murray*, 487 U.S. at 535. The agents did not disturb the suspected contraband but applied for a search warrant. *Murray*, 487 U.S. at 535-36.

Their application did not mention the illegal entry or the resultant observations but relied on other information. *Murray*, 487 U.S. at 535-36. Eight hours after the initial entry, the magistrate issued the search warrant. *Murray*, 487 U.S. at 536. The agents returned to the warehouse and executed the warrant. *Murray*, 487 U.S. at 536. The defendants moved to suppress the evidence seized per the warrant. Their motions were denied, they were convicted, and the judgments were affirmed. *Murray*, 487 U.S. at 535-36.

¶ 49    On appeal to the Supreme Court, the defendants contended that the evidence should have been suppressed. *Murray*, 487 U.S. at 535. The defendants acknowledged what the Court had held earlier:

> " '[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position than they would have been in if no police error or misconduct had occurred.…When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.' " (Emphasis in original.) *Murray*, 487 U.S. at 537 (quoting *Nix v. Williams*, 467 U.S. 31, 443 (1984)).

¶ 50    The *Murray* defendants contended that the independent-source rule applied "only to evidence obtained for the first time during an independent lawful search." *Murray*, 487 U.S. at 537. The Court disagreed, holding that the rule applied as well to evidence that was discovered during the illegal entry; the crucial consideration was whether the police would have discovered the evidence through lawful means. *Murray*, 487 U.S. at 537.

¶ 51    Turning to the case before it, the Court held:

"Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply. Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." (Emphasis in original.) *Murray*, 487 U.S. at 541.

The Court remanded the cause to the federal appellate court with instructions to remand the cause to the trial court for a determination of whether the agents would have sought the warrant had they not made the initial illegal entry. *Murray*, 487 U.S. at 543-44.

¶ 52    Had appellate counsel raised the suppression issue, it would not arguably have succeeded, based on *Murray*. The only meaningful distinction between Murray and this case is that, in *Murray*, the trial court still needed to apply the independent-source rule to the evidence before it and determine whether the police would have sought the warrant absent the illegal search. Here, of course, the trial court *did* apply the law and concluded that the police would have obtained the warrant. In so holding, the court relied on what Grey and the other officers did after they completed the illegal entry. Instead of applying for a warrant forthwith, Grey sought further information, interviewing Nelson and showing him a photographic lineup. Nelson disclosed more details about the encounter and identified defendant as the perpetrator. Grey's further inquiry produced more support for a conclusion that evidence of a crime would be found in apartment 230. At that point, Grey filled out a warrant application that included information that was obtained before the illegal entry as well as information that had been obtained legally afterward. On the basis of this information, and not the illegal observations, the magistrate issued the search warrant.

¶ 53    Defendant relies on the allegation (which we have assumed to be true for purposes of this appeal) that Grey did not obtain probable cause until after he opened the door and saw the bullet fragment.  But even so, defendant's argument assumes that, had the officers not made the illegal entry, they would have accepted the lack of probable cause and just given up.  The evidence amply justified the trial court in concluding otherwise.  The court properly found that, had the officers not made the illegal entry, they would have investigated further, obtained more non-tainted information to bolster what they already had, and applied for a search warrant.  Not only was this consistent with what the officers did, but Grey testified, in any event, that he would have pursued his investigation by seeking to obtain proper access to the crime scene.

¶ 54    For the foregoing reasons, the trial court did not err in summarily dismissing defendant's postconviction petition.

¶ 55                                    III. CONCLUSION

¶ 56    The judgment of the circuit court of Du Page County is affirmed