

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00116-CR

Anton Jamail **HARRIS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2018CR3427
Honorable Frank J. Castro, Judge Presiding

Opinion by:  Irene Rios, Justice

Sitting:  Rebeca C. Martinez, Chief Justice
Irene Rios, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: April 27, 2022

AFFIRMED

Appellant Anton Harris appeals the trial court's order denying his motion to suppress DNA evidence obtained pursuant to two different search warrants.  In his first issue, Harris argues the DNA evidence should have been suppressed because it is the fruit of a prior illegal seizure of Harris's DNA.  In his second issue, Harris argues he was denied due process of law when the prosecutor asked the jury to consider the application of parole laws during jury argument of the punishment phase of trial.  We affirm.

BACKGROUND

Law enforcement suspected Harris, a high school student, had committed the offenses of aggravated sexual assault and aggravated robbery. Without obtaining a search warrant, detectives from the San Antonio Police Department ("SAPD") arrived at Harris's high school on June 1, 2017, and asked Officer Andrew Adams from the Northside ISD Police Department to help procure a sample of Harris's DNA.

Harris was drinking from a cup with a straw as he was sitting at a table with his friend, Carlos, in the school cafeteria. Harris momentarily left the table to take a sandwich to his girlfriend, leaving his cup at the table with Carlos. When Harris left the table, Officer Adams directed a school custodian to collect Harris's cup and straw. Carlos told the custodian Harris was not finished with the drink and would be returning. Officer Adams, who went to the table as well, stated the custodian had already touched the straw and the custodian should give Harris a new, clean straw. Carlos agreed and Officer Adams pulled the used straw from the cup and gave it to the SAPD detectives. The detectives collected DNA from Harris's straw and confirmed his DNA could not be excluded as being a match to the DNA collected from several sexual assault cases, including the one they were investigating.

On June 8, 2017, law enforcement obtained a search warrant to collect samples of Harris's DNA ("the 2017 Warrant").[1] To show probable cause, the affidavit attached to the 2017 Warrant application stated the DNA collected from the straw could not be excluded as being a match to the DNA collected at the crime scenes.

---

[1] There were two search warrants obtained in 2017. One was a search warrant to search for items stolen from the sexual assault victims during the commission of the crime. The other was a search warrant to obtain samples of Harris's DNA. The 2017 Warrant refers to the warrant to obtain samples of Harris's DNA.

On April 2, 2018, Harris was indicted for aggravated sexual assault with a deadly weapon and aggravated robbery with a deadly weapon. On July 18, 2019, law enforcement obtained a second search warrant to collect a sample of Harris's DNA ("the 2019 Warrant"). The 2019 Warrant affidavit did not reference the DNA collected from the straw.

Harris filed a motion to suppress DNA evidence obtained from the straw and the two subsequent search warrants. During the motion to suppress hearing, Harris argued the school custodian's seizure of the straw was an illegal search and seizure in violation of the Fourth Amendment. Harris argued DNA evidence from the straw and any fruits of that illegal seizure—including additional DNA samples later obtained under the 2017 Warrant and the 2019 Warrant—should be excluded from evidence.

The trial court found the initial seizure of the straw was an illegal search and seizure under the Fourth Amendment and excluded evidence obtained from the straw. However, the trial court determined the DNA samples obtained pursuant to the 2017 Warrant and the 2019 Warrant were not fruits of the illegal search and seizure and denied Harris's motion to suppress the DNA evidence obtained pursuant to those warrants.

The jury found Harris guilty of the offenses of aggravated sexual assault and aggravated robbery, and assessed punishment at ninety-nine-years' confinement for the aggravated sexual assault conviction and sixty-years' confinement for the aggravated robbery conviction to run concurrently. Harris appeals.

### MOTION TO SUPPRESS

In his first issue, Harris argues the trial court erred when it did not exclude the DNA samples collected under the 2017 Warrant and 2019 Warrant. According to Harris, the evidence obtained under these warrants were fruits of the illegal seizure of the straw.

The State argues the trial court did not err because: (1) the 2019 Warrant is based on information independent of the seizure of the straw; (2) the 2017 Warrant contained probable cause even if all references to the straw are redacted; and (3) the straw was not obtained in violation of the Fourth Amendment because the school custodian received third-party consent from Carlos to take the straw.[2]

## A.  Standard of Review

We review a trial court's ruling on a motion to suppress using a bifurcated standard, giving almost total deference to a trial court's determination of the historical facts supported by the record, and reviewing the trial court's application of the law de novo.  *Wells v. State*, 611 S.W.3d 396, 405–06 (Tex. Crim. App. 2020).  "Ordinarily, the preference for searches based upon warrants requires reviewing courts to give 'great deference' to a magistrate's determination of probable cause."  *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).  "If the ruling of the trial court is correct under any applicable theory of law, we will sustain its ruling."  *Wells*, 611 S.W.3d at 406.

## B.  The Exclusionary Rule

"The cornerstone of the Fourth Amendment and its Texas equivalent is that a magistrate shall not issue a search warrant without first finding 'probable cause' that a particular item will be found in a particular location."  *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007).  "An affiant must present an affidavit that allows the magistrate to independently determine probable cause and the magistrate's actions cannot be a mere ratification of the bare conclusion of others."  *Id.* at 61 (quotation marks and alterations omitted).

---

[2] We do not address the State's argument that the custodian received third-party consent to seize the straw.  The trial court found that the straw was seized in violation of the Fourth Amendment.  The State does not appeal the trial court's ruling regarding the straw and the issue is not before us on appeal.  *See Bates v. State*, 155 S.W.3d 212, 214 n.2 (Tex. App.—Dallas 2004, no pet.).

"Probable cause exists when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a [person] of reasonable prudence to believe that the instrumentality of a crime or evidence pertaining to a crime will be found." *Hyland v. State*, 574 S.W.3d 904, 910 (Tex. Crim. App. 2019) (quotation marks omitted). "Neither federal nor Texas law defines precisely what degree of probability suffices to establish probable cause, but that probability cannot be based on mere conclusory statements of an affiant's belief." *Rodriguez*, 232 S.W.3d at 61.

"In determining whether probable cause exists to support the issuance of a search warrant, the magistrate to whom the probable cause affidavit is presented is confined to considering the four corners of the search warrant affidavit, as well as to logical inferences the magistrate might draw based on the facts contained in the affidavit." *Hyland*, 574 S.W.3d at 910–11. "The test is whether a reasonable reading by the magistrate would lead to the conclusion that the affidavit provided a substantial basis for the issuance of the warrant, thus, the magistrate's sole concern should be probability." *Rodriguez*, 232 S.W.3d at 60 (quotation marks and alterations omitted). "The determination of whether probable cause exists is a 'totality of the circumstances' inquiry, based on the magistrate's reasonable reading of the affidavit, but the magistrate may not act as a mere 'rubber stamp.'" *Hyland*, 574 S.W.3d at 911 (quoting *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012)).

The exclusionary rule of the Fourth Amendment generally prohibits the introduction at trial of not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence discovered later that is derivative of an illegality, or that constitutes "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984). In other words, "the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect

result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint[.]" *Murray v. United States*, 487 U.S. 533, 536–37 (1988) (quotation marks omitted).[3]

### C. The Independent Source Doctrine

When the causal connection between the constitutional violation alleged and the discovery of the evidence challenged is broken, however, the independent source doctrine operates as an exception to the exclusionary rule. *Wehrenberg v. State*, 416 S.W.3d 458, 466 (Tex. Crim. App. 2013).[4] "At its core, the independent source doctrine provides that evidence derived from or obtained from a lawful source, separate and apart from any illegal conduct by law enforcement, is not subject to exclusion." *Id.* 465 (citing *Murray*, 487 U.S. at 537). Explaining its rationale, the Supreme Court has explicated:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred . . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Murray*, 487 U.S. at 537 (alterations and emphasis in original).

Under the independent source doctrine, "evidence actually obtained pursuant to a distinct, untainted source is not subject to suppression because, in such cases, the prior illegality does 'not contribute in any way to discovery of the evidence seized under the warrant.'" *Wehrenberg*, 416 S.W.3d at 469 (quoting *Segura*, 468 U.S. at 815). "The independent source doctrine thus removes from the scope of the exclusionary rule evidence actually obtained pursuant to an

---

[3] The legislature codified the exclusionary rule in article 38.23 of the Texas Code of Criminal Procedure, which requires the exclusion of evidence "obtained . . . in violation of any provisions of the [c]onstitution or laws of the State of Texas, or of the Constitution or laws of the United States of America . . . ." TEX. CODE CRIM. PROC. art. 38.23(a).
[4] In *Wehrenberg v. State*, 416 S.W.3d 458 (Tex. Crim. App. 2013), the Texas Court of Criminal Appeals formally adopted the federal independent source exception to the exclusionary rule.

independent source, so long as the source (such as a valid search warrant) is truly independent and untainted by the prior police conduct." *Wehrenberg*, 416 S.W.3d at 472. "[I]n cases involving a warrant obtained after an initial unlawful search . . . , the challenged evidence is nevertheless admissible so long as the 'search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue.'" *Id.* at 467 (quoting *Murray*, 487 U.S. at 542). "Ultimately, a search warrant is valid and can attenuate unconstitutional police actions if there is sufficient untainted probable cause to support it." *Gonzalez v. State*, 608 S.W.3d 98, 106 (Tex. App.—San Antonio 2020, pet. ref'd).

*D. Analysis*

The affidavit attached to the application for the 2019 Warrant contained information obtained by law enforcement before the illegal seizure of the straw and stated the following reasons the affiant has probable cause to support the warrant:

- Harris's profile fit the victims' description of the perpetrator.

- Law enforcement observed Harris acting suspiciously in the parking lot of a café in the geographic location where the sexual assaults occurred.[5] Specifically, the affidavit stated: "Officer Morgan observed [Harris] 'sitting between vehicles in darkened areas, stand to observe foot traffic, then move to sit down between a different set of cars. During these events, several women in groups would enter and leave the café, and [Harris] would walk away and sit at different locations.'"

- Harris lived in the geographic area where the sexual assaults occurred and where Officer Morgan observed Harris's suspicious behavior.

- A woman—matching the demographic of the sexual assault victims, and who lived in the vicinity where the sexual assaults occurred—previously reported Harris for Lewd Conduct when he inappropriately groped her.

- Harris's facial characteristics matched a composite sketch that was created based on information from one of the sexual assault victims.

- Law enforcement officers located a hole in the fence that separated Harris's apartment complex from the apartment complex where at least one of the sexual assaults occurred. The officers located a second hole that, "if entered, would

---

[5] Twenty minutes later, Harris identified himself to two officers who approached him at a Valero gas station.

lead to the greenbelt area and access to the apartment complexes for each of the previous rapes/attacks." A resident in Harris's apartment complex told law enforcement he had seen an individual—matching the victims' description of the perpetrator—jogging along the fence with the holes.

- A female reported an interaction with an individual matching the perpetrators mode of operation. Law enforcement obtained surveillance video of an individual matching the physical description from the female's complaint and verified it was Harris.

In sum, the affidavit stated: "The victim's description is entirely consistent with the physical description of the suspect in all other cases in this investigation, the manner and means used by the suspect in this criminal action matches the common scheme used by the suspect in all of the other cases, and took place in the same apartment complex wherein [Harris] was cited for Lewd Conduct towards a woman in the same demographic as the victims in all other cases in this investigation."

The 2019 Warrant affidavit did not include any reference to the unlawful seizure of the straw. Instead, it provided: (1) the profile of the person suspected to have committed the sexual assaults; (2) law enforcement had observed Harris acting suspiciously—hiding and watching women as they exited a café in the vicinity the sexual assaults took place; (3) Harris had been cited for lewd conduct in the vicinity where he groped a woman fitting the demographic of the sexual assault victims; (4) there were similarities between Harris's face and a sketch drawn by a sketch artist based on the victim's description of the perpetrator; (5) Harris lived in the general area that all the sexual assaults occurred; (6) Harris was identified by video surveillance as wearing the same clothes and matching the description given by a woman who had been confronted by a man in a dark area of her apartment complex; and (7) information indicating the perpetrator lived in the same apartment complex as Harris. The affiant further averred that Harris matched the profile of the person suspected to have committed the sexual assaults. All this information was obtained by law enforcement prior to the illegal search and seizure of the straw. The 2019 Warrant affidavit

also stated law enforcement had determined Harris and the perpetrator were both left-hand dominant and Harris's varsity basketball schedule did not conflict with the time frames of the sexual assaults.[6]

Here, the record supports the trial court's determination that the prior illegal search and seizure of the straw did not contribute in any way to the discovery of the DNA evidence seized pursuant to the 2019 Warrant. Thus, the independent source doctrine removed the evidence obtained pursuant to the 2019 Warrant from the scope of the exclusionary rule. The probable cause established by the 2019 Warrant affidavit is independent of the information obtained from the illegal seizure of the straw, and the prior illegality did not have any bearing on the magistrate's decision to issue the 2019 Warrant because neither the straw nor the results of the DNA collected from the straw were mentioned in the affidavit. *See Wehrenberg*, 416 S.W.3d at 467 ("[I]n cases involving a warrant obtained after an initial unlawful search . . . , the challenged evidence is nevertheless admissible so long as the 'search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue.'" (quoting *Murray*, 487 U.S. at 542)). Accordingly, the 2019 Warrant affidavit contains sufficient information that is untainted by the prior illegal search and seizure of the straw and the trial court did not err when it denied Harris's motion to suppress DNA evidence obtained pursuant to the 2019 Warrant.

Because we determine the DNA evidence obtained pursuant to the 2019 Warrant was not subject to the exclusionary rule, we need not address whether the DNA evidence obtained pursuant to the 2017 Warrant should have been suppressed. Any alleged error in denying Harris's motion to suppress DNA evidence obtained by the 2017 Warrant would have been harmless because the same evidence was properly obtained pursuant to the 2019 Warrant.

---

[6] It is unclear whether this information was obtained by law enforcement prior to the illegal search and seizure of the straw.

Harris's first issue is overruled.

**IMPROPER JURY ARGUMENT**

In his second issue, Harris argues the prosecutor's jury argument impermissibly applied parole law to Harris's case in order to obtain a greater sentence from the jury. The State argues: (1) the prosecutor's jury argument was not improper; and (2) even if improper, the error was harmless. Assuming without deciding there was error, we overrule Harris's second issue because the alleged error was harmless.

*A. The Jury Argument*

Harris complains about the italicized portions of the State's jury argument during the punishment phase of trial:

> State: And respectfully to [defense counsel's] suggestion at 30 years, as the Court read to you in the charge . . . , this is the type of charge where *you must do day for day, at least half of it, and then somewhere parole authorities decide.* And that's all any of us can say.
>
> *But I would submit to you that 50 percent of 30 years, the facts in Jane's case alone say no.* And the reason we say that, typically people in my office, we get here to this point and we talk to representatives of the community and we say protect the public.
>
> If you talk with sexual assault victims and you work with getting them to get the courage to come here and to take that stand to recount to you the worst day of their lives, they frequently will say I don't want this to happen to anyone else. And we understand that. We applaud that. But the problem that approach has, and it stayed with me since I first got this case, that if we *focus about some future rape victim down the road after the parole authorities do whatever—*
>
> Defense: Objection to improper argument, talking about parole, Judge.
>
> The Court: Overruled.
>
> State: If we focus on somebody in the future, we, in effect, minimize what happened to the women in the case in which you heard evidence.

The jury assessed punishment at ninety-nine-years' confinement for the aggravated sexual assault conviction and sixty-years' confinement for the aggravated robbery conviction to run concurrently.

*B. Harm Analysis*

"What a jury can properly do, in following the charge, is determine how long a term it wishes a defendant to serve before that defendant may become *eligible* for parole because the jury is . . . furnished the formula for determining eligibility." *Waters v. State*, 330 S.W.3d 368, 374 (Tex. App.—Fort Worth 2010, pet. ref'd). "A jury, however, may not consider when, if ever, that defendant actually might be *awarded* parole . . . ." *Id.*

Improper jury argument is non-constitutional error and must be disregarded unless it affected the substantial rights of the appellant. *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000). To determine if an appellant's substantial rights were affected, we weigh: (1) the severity of the misconduct; (2) any curative measures; and (3) the certainty of the punishment assessed absent the misconduct. *Orcasitas v. State*, 511 S.W.3d 213, 220 (Tex. App.—San Antonio 2015, no pet.); *see also Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (tailoring the harm-analysis factors for error committed during punishment phase of trial by changing the third factor from certainty of conviction absent the misconduct to "certainty of the punishment assessed absent the misconduct."). An error that has no influence, or only a slight influence on the verdict should be deemed harmless. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

*Severity of the Misconduct*

"[A] thin line separates 'paraphrasing' and 'applying' parole law to a particular defendant." *Perez v. State*, 994 S.W.2d 233, 237 (Tex. App.—Waco 1999, no pet.). The jury charge stated: "[T]he defendant will not become eligible for parole until the actual time served equals one-half

of the sentence imposed or 30 years, whichever is less . . . ." The State's argument that you must serve half your sentence before parole authorities make a decision simply paraphrases the jury charge regarding parole law. The State's argument that a thirty-year sentence—as requested by defense counsel—is too short appears to assume parole will be granted and Harris will only serve a fifteen-year sentence. However, the argument Harris complains about is only one sentence in the State's closing arguments and is not repeated. Finally, the State's argument regarding future rape victims after the "parole authorities do whatever" is not an application of parole law to Harris.

*Curative Measures*

The trial court gave the following instructions to the jury in its jury charge:

The length of time for which a defendant is in prison may be reduced by the award of parole.

Under the law applicable in this case if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less . . . . Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by the parole authorities.

You may consider the existence of the parole law. You are not to consider the manner in which the parole law will be applied to this defendant.

*See* TEX. CODE CRIM. PROC. art. 37.07, § 4(a) (requiring the trial court to give instructions regarding parole law when the jury is assessing punishment for aggravated sexual assault and aggravated robbery); *see also id.* art. 42A.054(a)(9), (11).

Relevant to Harris's complaint, the jury charge instructed the jury that it "may consider the existence of the parole law[,]" but it may not "consider the manner in which the parole law will be applied to this defendant." The jury was further instructed that "[e]ligibility for parole does not guarantee that parole will be granted" and "[i]t cannot accurately be predicted how the parole law

might be applied to this defendant . . . because the application of that law will depend on decisions made by the parole authorities."

Assuming without deciding the prosecutor's comments were an improper invitation for the jury to consider Harris's eligibility for parole, the trial court's charge explicitly instructing the jury not to consider the manner in which the parole law will be applied to Harris was a curative measure. *See Short v. State*, 681 S.W.2d 652, 655 (Tex. App.—Houston [14th Dist.] 1984, pet. ref'd) (holding instruction in jury charge cured allegedly improper statements during punishment phase of trial).

*Certainty of the Punishment Assessed Absent the Misconduct*

Here, the jury heard evidence during the punishment phase of the trial that Harris was a habitual offender who sexually assaulted several women in an increasingly violent manner over the course of two years.

One victim testified that Harris pushed his way into her home and, while holding a knife stated: "Don't scream or I'll kill you." When she tried to run, the victim testified Harris chased her into her bathroom, put the knife to her neck and told her to be quiet. Harris then pulled her into her bedroom, pulled off her shorts, put her legs over his shoulder and sexually assaulted her.

Another victim testified Harris knocked on her door and, when she opened the door, Harris pushed his way in and locked the door. The victim stated Harris had a knife and demanded money. When the victim gave Harris cash, he ordered her to go to the bedroom. She told Harris "he didn't have to do this," and he replied: "Shut up or I'll kill you." Harris pushed her face down on the bed, put the knife to the back of her neck, and sexually assaulted her.

Another victim testified she was entering her apartment when she heard a voice that said "turn around." When she turned around, she saw Harris with a gun pointed at her chest. Harris asked her if she was expecting anyone to come to her apartment that evening. When she responded

no, Harris told her: "If you're lying and someone comes home, I will kill you." Harris proceeded to take cash from the victim and told her to go upstairs. The victim testified that Harris followed her upstairs with the gun placed on the back of her neck. After they entered her bedroom, Harris told the victim to undress and bend over the end of the bed. The victim pleaded "please don't do this," but Harris held the gun to her ribs and proceeded to penetrate her digitally, and then sexually assaulted and sodomized her. When the victim tried to turn around, Harris stated: "Don't look at me or I will kill you."

In total, the jury heard testimony directly from six of the victims. The State argued that Harris's actions have forever affected the lives of the women he sexually assaulted, and he should, therefore, be assessed a life sentence.

Given the severity of the crimes committed by Harris—and the number of victims impacted—we cannot say with certainty that the jury would have sentenced Harris to less time had the prosecutor's comments not been made.

Accordingly, we overrule Harris's second issue.

## CONCLUSION

The judgment of the trial court is affirmed.

Irene Rios, Justice

DO NOT PUBLISH